90 N.J. Super. 582 (1966)
218 A.2d 875
DREW CHEMICAL CORPORATION, PLAINTIFF-APPELLANT,
v.
AMERICAN FORE LOYALTY GROUP, ETC., AND THE FIDELITY AND CASUALTY CO. OF NEW YORK, ETC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 7, 1966.
Decided April 6, 1966.
*584 Before Judges GOLDMANN and FOLEY.
Mr. Hugh J. O'Gorman argued the cause for appellant (Mr. Raymond L. Cunneen, attorney).
Mr. Peter W. Thomas argued the cause for respondents (Messrs. Lum, Biunno & Tompkins, attorneys).
GOLDMANN, S.J.A.D.
Plaintiff appeals from a Law Division judgment in favor of defendant Fidelity and Casualty Co. (Fidelity) following the filing of an opinion in which the trial judge held that plaintiff did not come within the coverage of Fidelity's automobile liability policy insuring Nappi Trucking Corporation (Nappi).
The facts are not in dispute. On August 21, 1961, Byford, an employee of Nappi, drove its tank truck to the premises of plaintiff Drew Chemical Corporation (Drew) for the purpose of delivering a fatty acid liquid. The liquid was to be transferred to a storage tank on plaintiff's premises. When Byford arrived at the premises he was met by Evans, an employee of Drew. Evans took an 18-foot hose (owned by Nappi and part of the truck's equipment) which had a coupling at either end, and attached one end to a valve on the truck and the other end to a valve on an iron pipeline which ran into plaintiff's vats. Drew's pumps supplied the mechanical force necessary to transfer the acid from the truck to the vats. Evans started the pump but there was no flow of acid. Believing that the Drew pipeline was clogged, Evans requested Byford to uncouple the hose at the truck so that he could clear the line. Byford did so and placed his end of the hose into a nearby ditch. Evans first attempted to unclog the line by running air pressure through it. When this proved unsuccessful, he ran steam under pressure through the line. The hose suddenly whipped about, striking Byford and injuring him. The movement of the free end of the hose was undoubtedly caused by the steam pressure dislodging the impediment in the Drew line.
*585 Byford recovered workmen's compensation from his employer, Nappi. He also instituted a personal injury action against Evans and his employer Drew, alleging that Evans' negligence had caused his injuries. In that suit Drew's general liability insurer requested Fidelity, as Nappi's automobile liability carrier, to defend and pay any judgment rendered in Byford's favor. It refused to do so. In the present action plaintiff Drew sought a declaratory judgment that it was an additional insured under the Fidelity policy. Further, it demanded that Fidelity indemnify it for the $4,000 which Byford recovered in his action against Drew, as well as for $110 in assessed costs and $300 in counsel fees incurred in defending the negligence suit.
The policy issued by defendant Fidelity to Nappi provided, under section I of the "Insuring Agreements,"

"Coverage A  Bodily Injury Liability
To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."
And section III under that heading defined "Insured" as follows:
"The unqualified word `insured' includes * * * (2) under coverages A and B, any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission * * *."
Paragraph 3(f) of the heading "Conditions" defined the word "use":
"Use of an automobile includes the loading and unloading thereof."
Plaintiff contended in the Law Division (as it does here) that the accident to Byford occurred during the unloading of the Nappi truck, and therefore it was an additional insured because of the loading and unloading clause of the policy. *586 Defendant took the position that there was no coverage because (1) the unloading had not commenced, and (2) even if it had, it was not the efficient cause of the accident. In addition, defendant claimed that there could be no coverage because of the workmen's compensation exclusion clauses of its policy. The Law Division judge held that the accident had occurred during the process of unloading, as that term is interpreted under the "complete operation" doctrine discussed below. He considered defendant's contention that the workmen's compensation exclusion clauses of its policy stood in the way of coverage as untenable, citing as authority our opinion in Maryland Cas. Co. v. N.J. Mfrs., etc., Ins. Co., 48 N.J. Super. 314, 321 et seq. (1958), affirmed 28 N.J. 17 (1958). (Defendant has abandoned its cross-appeal on this latter point.) However, while finding that the accident occurred while the unloading operation was in progress, the trial judge concluded that the necessary causal relation did not exist between the unloading or use of the truck and the accident.

I.
In construing the meaning and scope of the words "loading and unloading" in automobile liability policies, courts have been guided by one of two basic theories  the "coming to rest" doctrine and the "complete operation" doctrine. See Annotation, "Risks within `loading and unloading' clause of motor vehicle liability insurance policy," 95 A.L.R.2d (1964), supplementing 160 A.L.R. 1259 (1946). Under the "coming to rest" doctrine, unloading comprises "only the actual removing or lifting of the article from the motor vehicle up to the moment when the goods which are taken off the motor vehicle actually come to rest and every connection of the motor vehicle with the process of unloading ceases." Ibid., 95 A.L.R.2d, at p. 1129. On the other hand, the "complete operation" doctrine has been said to cover the entire process involved in moving the goods, from the moment they are given into the insured's possession until they are turned over *587 at the place of destination to the party to whom delivery is to be made. 12 Couch on Insurance (2d ed. 1964), § 45:128, pp. 197-198. We consider this doctrine as the more modern and enlightened one, supported by the weight of authority. See 95 A.L.R.2d, at pp. 1130 and 1134. It was clearly approved in the Maryland Casualty Co. case. As we said there, the "loading and unloading" clause is one of extension, expanding the meaning of the phrase "while using the automobile." The merit inhering in this view is that it reflects the reasonable contemplation of the parties.
The scope of the "complete operation" doctrine can only be determined in a particular factual context. We need not decide here whether that doctrine should be understood to encompass the entire period beginning with when the goods (here the fatty acid) leave their original location and continuing until the delivery has been completed. Compare St. Paul Mercury Ins. Co. v. Huitt, 336 F.2d 37, 42 (6 Cir. 1964). The question here is whether the tank truck was being unloaded when the accident occurred  specifically, had the unloading begun? Defendant contends it had not, for no chemical had left the truck. Plaintiff, on its part, claims that unloading began with the arrival of the Nappi truck at the hook-up site; and when the hose was connected to the outlet on the truck and to the intake of the Drew pipeline, and the valves turned on, the process of unloading was further advanced. Cf. Pellicano v. Royal Indemnity Co., 35 Misc.2d 259, 229 N.Y.S.2d 654 (Sup. Ct. 1962) (unloading of truckload of concrete held to have commenced with the arrival of truck at job site).
If the "complete operation" doctrine obliterates the distinction between preparations for loading and the loading itself (see Couch, op. cit., above), there is no reason for a distinction to be drawn between preparations for unloading and the unloading. To hold that the unloading had not begun until the actual passage of the acid through the hose would be to apply the constructional doctrine of "coming to rest." Since the hose was the means by which the acid was customarily unloaded, *588 the parties must have contemplated that it would have to be taken off the truck and attached to both the truck outlet and the Drew pipeline intake for unloading to start. In our view, therefore, the unloading began when Byford stopped the truck at the place he was to discharge the chemical, got out and began attaching the hose. Even more clearly, the turning on of the valves could be said to mark the beginning of the unloading. The existence of the clogged condition in the Drew line, and the clearing of that line, were simply events occurring in the subsequent course of the unloading. True, Drew's employee, Evans, had no way of knowing whether the permanent iron pipeline or the Nappi flexible hose was clogged (in fact, it was the Drew line), but both had to be open and clear before the tank truck could be unloaded.

II.
The trial judge held that the unloading of the truck was not the efficient cause of the accident. Although the fact that no chemical had left the truck did not dissuade him from finding that the accident had occurred during the complete operation of unloading, that fact, together with the fact that both the pipeline and the steam power were completely within Drew's control during the clearing of the line, led him to the conclusion he reached with respect to the lack of causal connection.
We are not dealing here with the problem of proximate cause, a necessary element for recovery on the merits in a tort action. Rather, the issue to be resolved is whether coverage existed under defendant's policy so that it would be obligated to defend Byford's suit against Drew.
The "complete operation" doctrine, in addition to extending to acts and events causing bodily injury connected in point of time with loading or unloading, represents a difference in the quantum and type of causation required to render applicable insurance coverage for loss suffered. This difference was most recently discussed in Employers' Liability Assur. *589 Corp. v. Indemnity Ins. Co., 228 F. Supp. 896 (D. Md. 1964), where the court said:
"* * * Thus, even where the loading and unloading clause is involved, the `coming to rest' doctrine seems to insist upon a causal connection between the injury and the use of the vehicle insured, or that the vehicle was an active factor in the loading or unloading operation which caused the injury. [Citations omitted]
Conversely, in `complete operation' jurisdictions, all that is required to establish coverage is that the act or omission which resulted in the injury was necessary to carry out the loading or unloading."
The trial judge expressly declined to consider the latter proposition as authority to be followed.
In Employers' Liability plaintiff insured Proctor & Gamble under a comprehensive liability policy, and defendant insured Kane Transfer Co. under an automobile liability policy. One of Kane's employees was injured when, in the course of loading his truck on Proctor & Gamble's premises, a door fell and struck him. He sued the company for negligence. Employers' Liability brought a declaratory judgment action to determine if Proctor & Gamble was covered under the "loading and unloading" clause of Indemnity's policy. The court held it was.
In Connecticut Indemnity Co. v. Lee, 168 F.2d 420 (1 Cir. 1948), the driver of an insured truck opened the doors to a sidewalk elevator preparatory to unloading his vehicle. He left the doors in a raised position while he returned to the truck for the parcels that were to be delivered. A passerby fell into the open shaft while the elevator was ascending. The court, applying Massachusetts law, held that the accident came within the loading and unloading clause of the insured's automobile liability policy:
"* * * the acts of the driver in driving up, opening the elevator doors and preparing to remove the packages were closely connected in time and uninterrupted. There was a causal relation between the unloading and the accident. The opening of the elevator doors was necessary in order to carry out the delivery and it was an integral part of the unloading process. We think that this is sufficient to establish the causal *590 relation between unloading and the accident which appears necessary under the Massachusetts decisions. We do not think that under the principles applicable in Massachusetts there is any requirement that some article from the vehicle cause the accident in order for the policy to cover the accident. * * *"
In Allstate Ins. Co. v. Valdez, 190 F. Supp. 893 (D. Mich. 1961), the owner of the insured automobile, a hunter, was ejecting shells from his shotgun preparatory to putting it in the trunk of the car. He slipped and fell; the gun discharged into the open trunk and killed a fellow hunter who was sitting in the car waiting for the owner to finish what he was doing. The court, applying Michigan law, held that the "complete operation" doctrine controlled and that the wrongful death came within the "loading and unloading" clause coverage of the automobile owner's policy. The insurance company contended that even under that doctrine there was lacking the prerequisite of a causal connection between the loading of the car and the accident because the owner was making no direct move toward placing the gun into the trunk when he was ejecting the shells. The court rejected that argument, stating that the ejecting of the shells was an integral part of the loading process, so that a sufficient causal relationship existed.
A similar result was reached in Raffel v. Travelers Indemnity Co., 141 Conn. 389, 106 A.2d 716 (Sup. Ct. Err. 1954). For "unloading" cases contra, see 95 A.L.R.2d, above, at p. 1151. We consider cases like those abstracted above as representing the better view. Most of the decisions which reach a contrary result may be distinguished on the ground that the cause of the accident was not a necessary step in, or directly related to, the unloading process.
The trial judge referred to what this court had said in Maryland Cas. Co. v. N.J. Mfrs., etc., Ins. Co., 48 N.J. Super. 314, above:
"The `loading and unloading' clause is a phrase of extension, expanding the term `while using the automobile.' For an accident to be covered by that clause it must have occurred during the process of loading or unloading the vehicle and be causally connected with that *591 act. There is a causal connection if the loading or unloading was the efficient cause of the accident. See generally, Annotation, 160 A.L.R. 1259 (1946)." (at p. 320)
Although he recognized that the causal relationship in loading and unloading cases differs from that involved in ordinary negligence actions, he nonetheless seized upon the words "efficient cause" in the above quotation, proceeded to define it as "one that necessarily sets the other causes in operation," and then held that a causal connection did not exist because no chemical had left the truck and the pipeline and steam were under the complete control of Drew's employee. In doing so he took too restrictive a view of language we used in passing, and which, on reflection, could have been refined to reflect more accurately the approach we adopt in this case.
In determining the existence of a causal connection, the proper approach is to consider whether the accident was, within reason, causally connected with the complete operation of unloading the Nappi truck. While the act of clearing the line was normally not a part of the unloading operation, it was, under the existing circumstances, a necessary one. The presence of the clogged line led to Evans taking a reasonable step in helping to unload the tank truck, and this with the implied permission of Byford, the driver. In short, the process of unloading the acid necessitated the very act (the clearing of the line) which, in turn, caused the accident.
Reversed and remanded for the entry of judgment consistent with the views herein expressed.