575 A.2d 416

RYDER/P.I.E. NATIONWIDE, INC., PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. HARBOR BAY CORPORATION, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND COLCON SERVICES, INC., TIMOTHY RODERMOND AND JUDITH RODERMOND, DEFENDANTS.

Argued February 13, 1990—Decided June 19, 1990.

*Brian R. Ade* argued the cause for appellant and cross-respondent (*Harwood Lloyd,* attorneys).

*Charles F. Sheeler* argued the cause for respondent and cross-appellant (*Hogger and Sheeler*, attorneys; *Charles F. Sheeler* and *Joseph Coult*, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents a narrow question regarding the coverage obligations of a company self-insured under *N.J.S.A.* 39:6–52. Specifically, the issue is whether a self-insurer's coverage obligation to an additional insured during a "loading and unloading" accident is limited to the minimum amounts of compulsory insurance mandated by *N.J.S.A.* 39:6B–1.

Our analysis has two considerations. We first examine an insurer's obligation to provide coverage to an additional insured in a loading and unloading accident in the context of a liability insurance policy. We then consider whether that obligation is limited when a company, rather than obtaining a liability policy from an insurance company, chooses to retain its own risk of loss by becoming a self-insurer.

I

The facts are not in dispute. On March 29, 1983, Timothy Rodermond was a truck driver employed by Byrnes Motor Express, a subsidiary of Ryder/P.I.E. Nationwide (Ryder). While Rodermond was making a delivery to Colcon Corporation (Colcon) at Harbor Bay, Inc.'s (Harbor Bay) warehouse, Harbor Bay's forklift operator, assisting in the delivery, injured him. The injury occurred during the "loading and unloading" phase of delivery.

Rodermond brought an action against Harbor Bay, which filed a third-party complaint against Ryder, seeking coverage as an additional insured. Relying on *Bellafronte v. General Motors Corp.*, 151 *N.J.Super.* 377, 376 *A.*2d 1294 (App.Div.), *certif. denied*, 75 *N.J.* 533, 384 *A.*2d 513 (1977), the trial court granted Harbor Bay's motion for summary judgment, requiring

Ryder to indemnify and defend Harbor Bay. That ruling has not been challenged by either party.

While the Rodermond suit was pending, Ryder brought a declaratory-judgment action to determine the extent of its liability. Ryder then paid $65,000 in settlement of the Rodermond claim, while retaining its right to continue the declaratory-judgment action. Ryder argued that it was liable on Harbor Bay's behalf for only $15,000, the minimum amount of motor-vehicle liability insurance mandated by *N.J.S.A.* 39:6B-1, and the amount for which it had posted an indemnity bond to qualify as a self-insurer. Harbor Bay asserted that Ryder must provide coverage for the full $65,000 amount of Rodermond's claim because it had assumed the risk as a self-insurer for claims up to $500,000.

At trial, Howard Flax, vice-president of Ryder, testified that Ryder had been self-insured since 1972. He further testified that in order to qualify as a self-insurer under *N.J.S.A.* 39:6–52, Ryder had to submit evidence of financial responsibility. According to Flax, Ryder posted an indemnity bond with the Division of Motor Vehicles limiting the obligations of its surety, American Casualty Company, to the minimum amount of security then required by *N.J.S.A.* 39:6–25—$10,000 for injury to one person, $20,000 for injury to more than one person, and $5,000 for property damage. Ryder later increased coverage under the bond to $15,000, $30,000 and $5,000, respectively, to comply with the revised statutory minimums set by the financial-security law, which amounts are the same as required under *N.J.S.A.* 39:6B–1, the compulsory motor-vehicle insurance law. Flax testified that Ryder also furnished general financial information as part of its application. Additionally, Flax said that in 1983 Ryder was self-insured up to $500,000 and had additional coverage under an insurance policy for the corporation, its officers, directors, and employees in excess of $500,000. Flax was the only witness at trial.

At the conclusion of trial, the court ruled that Ryder was liable for the entire $65,000 settlement. The court rejected Ryder's contention that its status as a self-insurer, the indemnity bond it posted with the Division of Motor Vehicles, or the fact that a third-party's negligence caused the injury limited its liability. Because Ryder was self-insured for claims up to $500,000, the court reasoned that it was liable for all judgments obtained against it for up to that amount.

On appeal, the Appellate Division reversed, holding Ryder liable for $15,000 of the Rodermond settlement. 241 *N.J.Super.* 453, 575 *A.*2d 489. The court found that "Ryder undertook to assume the risk of loss only for the mandatory minimum required of it by law ... the same coverage it would have been required to purchase ... if the Director had not allowed it to become a self-insured." The court reasoned that there is no "statutory or policy prohibition" against a self-insurer providing coverage only to the extent required by law, and obtaining excess coverage for its own personnel. Having established its willingness to provide that minimum coverage, as further evidenced by its posting an indemnity bond in that amount, the court concluded that Ryder was liable to Harbor Bay only for the minimum statutory amount of $15,000.

We granted Harbor Bay's petition for certification, 115 *N.J.* 73, 556 *A.*2d 1217 (1989), and reverse.[1]

## II

■ The obligation to provide coverage to an additional insured in a loading and unloading case can arise from the

---

[1] We also granted Ryder's cross-petition for certification, 115 *N.J.* 74, 556 *A.*2d 1217 (1989), to clarify that portion of the Appellate Division decision that improperly directed Ryder to pay $15,000 plus any interest on Harbor Bay's behalf. The record discloses that Ryder had previously paid $65,000 to the Rodermonds pending the outcome of this declaratory judgment action. Therefore, notwithstanding our disposition of this appeal, Ryder does not have to pay any additional money or interest to the Rodermonds on Harbor Bay's behalf.

explicit language in a liability policy. *Maryland Cas. Co. v. N.J. Mfrs. Ins. Co.*, 48 *N.J.Super.* 314, 137 *A.*2d 577 (App.Div), *aff'd*, 28 *N.J.* 17, 145 *A.*2d 15 (1958); *Drew Chemical Corp. v. American Fore Loyalty Group*, 90 *N.J.Super.* 582, 218 *A.*2d 875 (App.Div.1966). For example, in *Drew Chemical Corp., supra*, an employee of Drew Chemical Corporation (Drew), injured a Nappi Trucking Corporation (Nappi) truck driver when the truck driver was making a delivery at Drew's premises. When the truck driver brought an action against Drew, Drew asserted that Nappi's liability carrier must provide a defense. Nappi's liability policy defined "insured" as "any person ... using an owned automobile or ... any person or organization legally responsible for the use thereof," and defined "use" to include "loading and unloading." Because the accident occurred during the unloading of the Nappi truck, the court found that Drew was an additional insured under the "loading and unloading" clause of Nappi's policy. *Id.* at 591, 218 *A.*2d 875. Thus, *Drew* illustrates that in the "loading and unloading" context, an insurer's obligation to provide coverage arises from the terms of its contract, not from any rule of tort law.

New Jersey courts also have recognized that the obligation to provide coverage in a "loading and unloading" accident arises from statute and therefore cannot be limited by contract. *Bellafronte v. General Motors Corp., supra*, 151 *N.J.Super.* at 377, 376 *A.*2d 1294. There Bellafronte, a truck driver employed by Morrison Steel Company (Morrison), made a delivery to General Motors Corporation (GMC). During the course of unloading his truck, a negligent GMC crane operator injured Bellafronte. Bellafronte sued GMC, which impleaded Morrison, alleging that Morrison's liability carrier, New Jersey Manufacturer's Insurance Co. (NJM), should provide coverage for GMC as an "other insured." NJM argued that Morrison's policy excluded coverage explicitly to a person loading or unloading the vehicle.

The court first noted that *N.J.S.A.* 39:6–46(a), a provision of the Motor Vehicle Security Responsibility Law, specifically requires a policy to cover those persons "using or responsible for the use of any such motor vehicle with the ... consent of the insured." *Id.* at 380, 376 *A.*2d 1294. "[I]n order to effectuate the overriding legislative policy of assuring financial protection for the innocent victims of motor vehicle accidents," the court reasoned that "the substantive content of statutorily required coverage must be broadly construed." *Id.* at 382, 376 *A.*2d 1294 (citing *Motor Club of America Ins. Co. v. Phillips*, 66 *N.J.* 277, 293, 330 *A.*2d 360 (1974)). The court continued that one "who is in the process of unloading cargo from the vehicle is, for purposes of [ ] omnibus coverage, a user of the vehicle." *Id.* at 382–83, 330 *A.*2d 360. The court then concluded that because "the statute mandated coverage for GMC's crane operator [ ] using Morrison's truck, the crane operator must be deemed an 'other insured' of NJM." *Id.* at 383, 330 *A.*2d 360. The court therefore struck Morrison's policy exclusion, ruling that it was an "unwarranted attempt to diminish the extent of coverage required by statute." *Ibid.*

■ *Bellafronte* makes clear the broad *scope* of coverage that an insurer must provide for accidents arising during loading and unloading. Because of statutorily-imposed omnibus requirements, any contractual attempt to exclude coverage for an additional insured will be held invalid. Moreover, all parties subject to omnibus coverage requirements—both self-insurers and those with liability policies—must provide coverage. What *Bellafronte* does not address, however, is the limitation, if any, on the *amount* of coverage that an insurer must provide in the context of a loading and unloading accident.

■ Our cases construing liability policies do not suggest that minimum amounts of compulsory liability insurance, *N.J. S.A.* 39:6B–1, limit an insurer's coverage obligation for loading and unloading accidents. Moreover, common sense dictates that an insurer's liability, having contractual and statutory

roots, and not stemming from its own negligence, is not unlimited. Rather, our cases suggest that the limit of an insurer's liability is the amount of that insurer's liability policy. As the court in *Wakefern Food Corp. v. General Acc. Group,* 188 *N.J.Super.* 77, 455 *A.*2d 1160 (App.Div.1983), stated:

> We feel constrained to observe pragmaticably that declaratory judgment suits like the present one [loading and unloading coverage obligation] are, by large measure, solely between an automobile insurance carrier and a general liability carrier who covers the premises and operations liability of a business to whom goods are delivered or from whom goods are taken. One of the purposes for which the latter coverage is purchased is to protect the business operator from the risk of liability to his invitees resulting from the negligent maintenance of his premises. "Use" provisions and "loading and unloading" clauses are intended to protect the named insured and others who, in the pick-up or delivery process, are actually using the motor vehicle and its contents during the "complete operation."
>
> [*Id.* at 86, 455 *A.*2d 1160].

The trial court properly found, consistent with *Bellafronte, supra,* and broad omnibus principles, that Ryder must provide coverage to Harbor Bay as an additional insured. As a self-insured-company, however, Ryder is not protected by a liability policy in an amount indicating the extent to which it must provide coverage. Hence, to determine the extent of Ryder's obligation as a self-insurer, we turn to *N.J.S.A.* 39:6–52, the self-insurance statute, and to our caselaw examining a self-insurer's coverage obligations under that statute.

### III

Under *N.J.S.A.* 39:6–52(a), any person in whose name more than twenty-five vehicles are registered may qualify as a self-insurer by obtaining a certificate of insurance from the Director of the Division of Motor Vehicles (now from the Commissioner of Insurance). To receive such approval, one must satisfy the Director that "such person is possessed and will continue to be possessed of ability to pay judgments obtained against such persons." *N.J.S.A.* 39:6–52(b). Approval to operate as a self-insurer rests with the discretion of the Director. The statute does not set forth any specific criteria for the

Director to apply when evaluating applications for self-insurance, nor does it require an applicant to submit any specific financial information as a pre-requisite to becoming self-insured.[2] Ryder became self-insured in 1972 and thus made its application pursuant to the original statute. Hence, for purposes of this appeal, we will consider *N.J.S.A.* 39:6–52 prior to its amendment.

With respect to omnibus coverage requirements, New Jersey courts have held that a self-insurer's coverage obligations are co-extensive with the obligations of those possessing liability policies. In *Comorote v. Massey,* 110 *N.J. Super.* 124, 264 *A.*2d 478 (Law Div.1970), the court ruled that a self-insurer had to provide a defense to an employee who had been given a company car for business purposes, but who had used the car for his personal use. The court reasoned that when a self-insurer applies for and receives a certificate of self-insurance, it does so "with full knowledge and acceptance of all the provisions of applicable law"—including *N.J.S.A.* 39:6–46, which then required liability policies to provide broad-form omnibus coverage. *Id.* at 127, 264 *A.*2d 478. The court concluded that since "the Legislature has treated a self-insured synonymously with one possessing an automobile liability policy and has evidenced a strong public policy to protect persons wrongfully injured by motor vehicles[,] there appears no sound basis from excluding a self-insurer from omnibus coverage." *Id.* at 128, 264 *A.*2d 478.

Subsequently, in *Transport of New Jersey v. Watler,* 161 *N.J.Super.* 453, 391 *A.*2d 1240 (App.Div.1978), *aff'd as mod-*

---

[2]The Legislature amended *N.J.S.A.* 39:6–52 in 1988. *L.*1987, *c.* 428 (effective Jan. 14, 1988). The 1988 amendments emphasize the importance of obtaining all relevant financial information from the applicant. The Commissioner may make audits to determine the financial ability of the self-insurer, *N.J.S.A.* 39:6–52(e); the Commissioner may require the furnishing of a surety bond or evidence of excess insurance, *N.J.S.A.* 39:6–52(f); and the certificates are now issued only for a one year period, *N.J.S.A.* 39:6–52(c). Under the amendments, however, approval to operate as a self-insurer remains with the discretion of the Commissioner.

*ified,* 79 *N.J.* 400, 400 *A.*2d 61 (1979), the Appellate Division held that a self-insurer had to provide coverage for damage caused by uninsured motorists. The court reasoned that *N.J.S.A.* 39:6B–1, which requires minimum motor vehicle liability insurance coverage, together with *N.J.S.A.* 17:28–1.1, which provides that automobile liability policies on New Jersey motor vehicles must contain uninsured motorist coverage, "express the legislative intent that all New Jersey motor vehicles, covered by commercial insurance or self-insured, must be insured against injury for damages caused by uninsured motorists." *Id.* at 457, 391 *A.*2d 1240. In that same context we noted that the Appellate Division "found no reason in either logic or the legislative history of the applicable statutes to impose on self-insured vehicles a lesser obligation than that assumed by those covered by a commercial insurance policy." *Christy v. City of Newark,* 102 *N.J.* 598, 606, 510 *A.*2d 22 (1986). In affirming the Appellate Division's judgment in *Transport,* we added the following:

> The certificate of self-insurance issued to TNJ pursuant to *N.J.S.A.* 39:6–52 is a "policy" under which TNJ is insured for purposes of *N.J.S.A.* 39:6–62. Incorporated within this "policy" of self-insurance is the uninsured motorist coverage required of all motor vehicle insurance policies by *N.J.S.A.* 17:28–1.1 [79 *N.J.* at 401, 391 *A.*2d 1240.]

Addressing the question specifically left open by *Transport,* courts later held that self-insurers are obligated to extend uninsured-motorist benefits to their passengers for injuries caused solely by the negligence of uninsured motorists. *See Mortimer v. Peterkin,* 170 *N.J.Super.* 598, 407 *A.*2d 1235 (App.Div.1979); *Crocker v. Transport of New Jersey,* 169 *N.J. Super.* 498, 404 *A.*2d 1293 (Law Div.1979).

Essential to the resolution of the issue posed in *Comorote, Transport, Mortimer,* and *Crocker* was the view that with respect to the *scope* of coverage obligations, a certificate of self-insurance is the functional equivalent of a policy of insurance. The distinction between the two forms of coverage—not addressed in those cases—is the manner and the extent to which each carries its risk of loss. Those distinctions, however,

are critical to resolving the issue before us. We are aware that the nature of self-insurance, and the advantage for which it is sought, is that it allows a company to carry its own risk of loss and avoid payment of premiums for insurance coverage through a private company. *See Comorote v. Massey, supra,* 110 *N.J.Super.* at 127, 264 *A.*2d 478; *American Nurses Ass'n v. Passaic Gen. Hosp.,* 192 *N.J.Super.* 486, 492, 471 *A.*2d 66 (App.Div.), *aff'd in part, rev'd in part,* 98 *N.J.* 83, 484 *A.*2d 670 (1984).

██ Unlike a liability policy, however, which is purchased in amounts equal to or greater than the mandatory minimum required by law, *N.J.S.A.* 39:6B-1, a self-insurer does not carry that risk of loss to a specified dollar amount. Rather, there is no explicit limitation on a self-insurer's liability. A self-insured is responsible for all "judgments obtained against [it]," *N.J.S.A.* 39:6-52(b), to the extent that its assets are at risk to satisfy that obligation. *See Christy v. City of Newark, supra,* 102 *N.J.* at 608, 510 *A.*2d 22. As a practical matter, however, and as the 1988 amendments to the self-insurance statute suggest, a self-insurer may purchase excess insurance protection to shift its risk of loss for judgments rendered against it. *See N.J.S.A.* 39:6-52(f).

██ Against the backdrop of New Jersey's self-insurance scheme, we now turn to the issue before us: whether a self-insurer's coverage obligations for an additional insured during a "loading and unloading" case is limited to the minimum amounts of compulsory motor vehicle liability insurance mandated by *N.J.S.A.* 39:6B-1. In holding that Ryder was liable to Harbor Bay for only $15,000, the statutory minimum, the Appellate Division reasoned: "Ryder undertook to assume the risk of loss only for the mandatory minimum required of it by law * * * the same coverage it would have been required to purchase under the law if the Director had not allowed it to become self-insured." We disagree.

Under the terms of an ordinary liability policy, an insurer would be required to provide coverage in a "loading and unloading" accident to the limits of its policy—often an amount greater than the statutory minimum. Under the Appellate Division's logic, however, a self-insurer would be placed at a distinct advantage over one maintaining a liability policy insofar as its liability would be limited by *N.J.S.A.* 39:6B–1—a result that finds no justification in the self-insurance scheme or the insurance-coverage policies of this state.

*N.J.S.A.* 39:6–52 contemplates that a self-insurer should provide coverage for "all judgments obtained against [it]", but the statute does not suggest that that obligation is limited in any particular context, such as a "loading and unloading" accident. The obvious advantage of self-insurance is the avoidance of purchasing a liability policy. With that advantage, however, as *N.J.S.A.* 39:6–52 makes clear, comes the burden of carrying the risk of loss to the extent that a self-insurer's assets are at risk to satisfy any judgments rendered against it. *See Christy v. City of Newark, supra,* 102 *N.J.* at 608, 510 *A.*2d 22. In our view, such a scheme does not anticipate that a self-insurer's liability should be limited in an "loading and unloading" accident simply because liability is statutorily-imposed. Moreover, with respect to the scope of coverage obligations, it is the well-settled policy of this state to consider a self-insurance certificate as the equivalent of a policy of insurance. *See Transport, supra,* 79 *N.J.* at 401, 400 *A.*2d 61. We find no reason to make a distinction between the two forms of insurance coverage—self-insurance and a liability policy—based on *N.J.S.A.* 39:6B–1, with respect to the extent of statutorily-required coverage.

■ Nor can we agree with the Appellate Division that Ryder's indemnity bond is evidence of the extent of its liability. Ryder's Vice–President testified that to qualify as a self-insurer, Ryder had to demonstrate its financial responsibility. It therefore submitted general financial information to the Di-

rector of the Division of Motor Vehicles and posted an indemnity bond limiting the obligations of its surety to the minimum amounts of security then required by law. That bond did not represent the extent of Ryder's liability, but rather indicated that Ryder possessed sufficient financial ability to operate as a self-insurer.

As the recent amendments to *N.J.S.A.* 39:6–52 make clear, an indemnity bond is but one aspect of an overall financial scheme that the Commissioner considers when determining whether an applicant has the "ability to pay judgments obtained against [it]." Ryder's bond merely constitutes a guarantee that its surety will assume its liability if Ryder is unable to make full payment. Appleman, *Insurance Law & Practice*, § 4913 at 511 (1981). As the trial court properly noted, "the bond is to protect the public, not the principal." Thus, in this context, the bond does not limit Ryder's liability.

■ A self-insurer's liability for an additional insured during a "loading or unloading" accident is not limited by its indemnity bond nor by the minimum amounts of compulsory insurance mandated by *N.J.S.A.* 39:6B–1. If Ryder wanted to minimize its risk, it could have purchased an insurance policy, as it did by voluntarily obtaining excess coverage above $500,000 for damages incurred by the corporation, its directors, officers, and personnel. Ryder did not do so, preferring to remain, as conceded by its Vice President, self-insured for claims up to $500,000. Accordingly, we find that Rodermond's $65,000 claim for damages incurred while unloading his truck at Harbor Bay's premises is within the scope of Ryder's obligations as a self-insurer.

The judgment of the Appellate Division is reversed. We remand for entry of judgment directing that Ryder is liable for the full $65,000 amount of the Rodermond settlement on behalf of Harbor Bay.

CLIFFORD, J., dissenting.

In my disagreement with the majority, hermeneutics is not the weapon of choice. Logic is.

The liability of Ryder/P.I.E. Nationwide, Inc., (Ryder) is imposed as a result of its self-insured status rather than because of the violation of any duty owed to the injured worker, Roderman. In its capacity as a self-insurer, Ryder is picking up the liability of Harbor Bay Corporation, Inc. (Harbor Bay). Ryder does not contest the existence of its insuring obligation; it acknowledges that it must satisfy Harbor Bay's tort liability. The question is: what is the dollar extent of that obligation?

I would affirm substantially for the reasons expressed by the Appellate Division, which concluded that "Ryder undertook to assume the risk of loss only for the mandatory minimum required of it by law, which is currently $15,000/$30,000, the same coverage it would have been required to purchase under the law if the Director [of the Division of Motor Vehicles] had not allowed it to become a self-insured." At 406, 575 *A*.2d 418. It added that "there is no statutory or policy prohibition against a self-insured providing financial responsibility only to the extent required by law and also obtaining [as did Ryder here] additional insurance coverage in one form or another to cover only its own personnel." *Id.* at 406, 575 *A*.2d at 418.

I agree with all of that. The trouble comes from my uneasy feeling that we are flying blind: we do not know how self-insurance is administered, and neither the record nor oral argument shed any light. For instance, what must be included in the application for self-insurance? What "financial information" must the applicant submit to the Director (now the Commissioner of Insurance) under *N.J.S.A.* 39:6–52? What considerations guide the Director's exercise of discretion in determining whether to issue the certification of self-insurance? Are there limits on the extent to which one can become self-insured? If so, how is that limit determined? If there are no such limits, why not? Is there any difference in the liability of a self-in-

sured as a tortfeasor from its liability as an insurer? More specifically, if a a self-insured does not, unlike Ryder, obtain excess coverage (here, for liability of the corporate officers, directors, and employees above $500,000), are all the corporate assets at risk for insurance liability as well as tort liability?

Absent answers to those kinds of questions, I have little faith in the Court's conclusion and am remitted to the logic of the Appellate Division's approach.

I would affirm.

*For reversal and remand*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For affirmance*—Justice CLIFFORD—1.