688 A.2d 89

JOSEPH KENNEDY, PLAINTIFF, v. JEFFERSON SMURFIT COMPANY AND CONTAINER CORP. OF AMERICA, DEFENDANT AND THIRD PARTY PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. NORTH OPERATING COMPANY, THIRD PARTY DEFENDANT–RESPONDENT AND CROSS–RESPONDENT, AND ULTRA PACKAGING AND DAUMAN PALLETS, THIRD PARTY DEFENDANTS.

———————

JEFFERSON SMURFIT COMPANY AND CONTAINER CORP. OF AMERICA, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. FIREMAN'S FUND INSURANCE COMPANY, THE AMERICAN INSURANCE COMPANY, DEFENDANTS, AND NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT–APPELLANT.

Argued October 21, 1996—Decided February 5, 1997.

*George W. Connell* argued the cause for appellant New Jersey Manufacturers Insurance Company (*Connell, Foley & Geiser,* attorneys; *Richard T. Bayer* and *William J. Gross,* on the briefs).

*Joseph DiRienzo* argued the cause for respondent and cross-appellant Jefferson Smurfit Company and Container Corp. of America (*DiRienzo & Wallerstein,* attorneys; *Mr. DiRienzo* and *Martin B. Wallerstein,* on the briefs).

*Marvin Blakely* argued the cause for respondent and cross-respondent North America Operating Company (*De Veaux & Seidman*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents a narrow, legal issue regarding an insurer's obligation to provide coverage to an additional insured in a "loading and unloading" case under an omnibus automobile-insurance clause. Specifically, the question presented is whether the selection of a defective pallet is part of the loading process, and thus arises out of the "use of a motor vehicle."

I

The facts are substantially undisputed. Joseph Kennedy was the owner of a tractor that was leased to North Operating Company (North). North insured Kennedy's vehicle pursuant to the agreement between Kennedy and North. North entered into a cargo-shipping agreement with Jefferson Smurfit Company (Jefferson). On February 21, 1991, Kennedy was dispatched by North to Jefferson's facility to pick up a loaded trailer (owned by North) filled with cardboard, which he was to deliver to Ultra Packaging Corporation (Ultra). The cardboard was on wood pallets in bundles weighing hundreds of pounds. Kennedy testified that before leaving Jefferson for Ultra, he visually inspected the load and found everything in order. After arriving at Ultra, Kennedy waited in the trailer and observed the unloading procedure. Suddenly, a pallet collapsed, and the cardboard fell on Kennedy, causing injuries. According to Kennedy, the collapsed pallet was rotted.

Kennedy filed suit against Jefferson, alleging that his injuries were caused by the defective pallet used by that company. Jefferson filed an Answer and Third–Party Complaint against North, the owner of the trailer, and others. Jefferson, a self-insured company, then filed a declaratory judgment action against New

Jersey Manufacturers Insurance Company (NJM), the motor vehicle insurance carrier for North, seeking coverage under the "use" provision of its "Trucker's Policy," and Fireman's Fund, North's comprehensive general liability carrier. Jefferson conceded its own negligence and settled Kennedy's personal-injury claim for $750,000.

Thereafter, the Third–Party Complaint was consolidated with the declaratory judgment action, and both NJM and North filed motions for summary judgment. Jefferson opposed the motions, and cross-moved for summary judgment. The trial court denied NJM's motion for summary judgment, but granted Jefferson's cross-motion for summary judgment against NJM in the amount of $750,000. The court also granted North's motion for summary judgment, thereby preventing Jefferson from seeking indemnification from North.

On appeal, the Appellate Division affirmed, "conclud[ing] that NJM's policy covers Jefferson for Kennedy's injury, because the injury was causally connected with the complete operation of loading and unloading North's truck." *Kennedy v. Jefferson Smurfit Co.,* 287 *N.J.Super.* 117, 127, 670 *A.2d* 577 (1996) (citing *Drew Chem. Corp. v. American Fore Loyalty Group,* 90 *N.J.Super.* 582, 591, 218 *A.2d* 875 (App.Div.1966)). The Appellate Division remanded the case for a determination of the reasonableness and good faith of Jefferson's $750,000 settlement with Kennedy, because there had been no showing that the settlement fairly reflected the seriousness of the injuries suffered. Finally, because of the panel's determination that the automobile policy covered Jefferson for Kennedy's injury, the panel declared moot Jefferson's appeal of the trial court's judgment that North owed Jefferson no indemnification under the trucking agreement. NJM filed a petition for certification to review the decision that its automobile insurance policy provided coverage to Jefferson for Kennedy's injuries. Contingent on a grant of NJM's petition, Jefferson filed a cross-petition to appeal the issue of North's obligation to indem-

nify Jefferson. We granted both petitions. 144 *N.J.* 585, 677 *A.*2d 759 (1995).

## II

NJM concedes in its petition that the use of pallets is a standard technique in shipping goods, but asserts that in this case the selection of the pallet was not an integral part of the loading or unloading process, and is a "separate act" that does not trigger motor vehicle insurance coverage. We disagree.

### A.

The "Trucker's Policy," issued by NJM to North, provides that NJM "will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or *use* of a covered auto." (Emphasis added). The parties concede that North's trailer was a "covered auto" under the policy, and that North and its employees were covered by the policy. *Kennedy, supra,* 287 *N.J.Super.* at 120, 670 *A.*2d 577. The policy also contained an "omnibus" clause, purporting to include all parties who use or operate a covered auto, as insureds: "Anyone else is an insured while using with your [North's] permission a covered auto you own, lease or borrow...."

That the concept of "use of a vehicle" includes the acts of loading and unloading the vehicle is well settled. In *Ryder/P.I.E. Nationwide, Inc. v. Harbor Bay Corp., Inc.,* 119 *N.J.* 402, 575 *A.*2d 416 (1990), we recognized that "[t]he obligation to provide coverage to an additional insured in a loading and unloading case can arise from the explicit language in a liability policy." 119 *N.J.* at 406–07, 575 *A.*2d 416 (citing *Maryland Casualty Co. v. New Jersey Mfrs. (Casualty) Ins. Co.,* 48 *N.J.Super.* 314, 137 *A.*2d 577 (App.Div.), *aff'd,* 28 *N.J.* 17, 145 *A.*2d 15 (1958); *Drew Chem. Corp. v. American Fore Loyalty Group,* 90 *N.J.Super.* 582, 218 *A.*2d 875 (App.Div.1966)). We also emphasized that New Jersey courts have found that "the obligation to provide coverage in a

'loading and unloading' accident arises from statute and therefore cannot be limited by contract." *Ryder, supra,* 119 *N.J.* at 407, 575 *A.*2d 416 (citing *Bellafronte v. General Motors Corp.,* 151 *N.J.Super.* 377, 376 *A.*2d 1294 (App.Div.), *certif. denied,* 75 *N.J.* 533, 384 *A.*2d 513 (1977)).

*Maryland Casualty, supra,* first provided a framework for determining coverage for loading and unloading activities. In that case, the court determined that for an accident to be covered by the "loading and unloading" clause in an automobile-insurance policy, the injury "must have occurred during the process of loading or unloading the vehicle and be causally connected with that act." 48 *N.J.Super.* at 320, 137 *A.*2d 577.

In *Maryland Casualty,* the driver of a truck owned by William H. Bair Company was injured when an employee of the Camden Marine Terminal, who was using a forklift to load the Bair truck with rolls of paper taken from a barge, negligently loaded a roll of paper so that it struck the driver. *Id.* at 317–18, 137 *A.*2d 577. Contrary to the insurer's allegation that the forklift operator was not "using" the truck within the meaning of the "loading and unloading" clause of the policy, the court found that

> [t]he Bair truck was unquestionably being used with the permission of its owner, the named insured under Manufacturers' policy. Not only was Kelly, its driver, so using it, but every employee of the terminal who was assigned to loading the truck with the rolls of paper brought from the barge. Cherry was such an employee, and it matters not the slightest that he may have stopped his fork lift just short of the back of the truck and from that point raised the roll of paper to the loading point. What he was doing was part of the *complete operation of loading.*
>
> [*Id.* at 321, 137 *A.*2d 577 (emphasis added).]

In *Drew, supra,* 90 *N.J.Super.* 582, 218 *A.*2d 875, the court extended the concept of causation in loading and unloading cases. The "coming to rest" doctrine of unloading, in which coverage exists only from the time the goods are removed or lifted from the truck to the moment the removed goods come to rest, was rejected by the *Drew* court in favor of the more "modern and enlightened" "complete operation" doctrine. *Id.* at 586–87, 218 *A.*2d 875. In "complete operation" jurisdictions, "all that is required to establish coverage is that the act or omission which

resulted in the injury was necessary to carry out the loading or unloading." *Id.* at 589, 218 *A.2d* 875 (quoting *Employers' Liability Assurance Corp. v. Indemnity Ins. Co.*, 228 *F.Supp.* 896, 899–900 (D.Md.1964)).

In *Drew*, the driver of a tank truck owned by Nappi Trucking Corporation was injured after driving his truck, loaded with liquid fatty acid, to the premises of Drew Chemical Corporation. The hose used to transfer the acid from the truck to Drew's vats was clogged, and the Drew employee attempted to unclog the line by running air pressure through it. During that procedure, the hose suddenly whipped about, striking and injuring the driver of the Nappi truck.

The Appellate Division reversed the judgment of the trial court, concluding that "the process of unloading the acid necessitated the very act (the clearing of the line) which, in turn, caused the accident." *Drew, supra*, 90 *N.J.Super.* at 591, 218 *A.2d* 875. Under the "complete operation" doctrine, as defined by the *Drew* court, the distinction between preparations for loading and the act of loading is obliterated. *Id.* at 587, 218 *A.2d* 875; 12 *Couch on Insurance 2d* § 45:128, at 376–77 (rev.ed.1981).

In *Cenno v. West Virginia Paper & Pulp Co.*, 109 *N.J.Super.* 41, 262 *A.2d* 223 (App.Div.), *certif. denied*, 56 *N.J.* 99, 265 *A.2d* 149 (1970), the court outlined the inquiry courts must make in determining whether a particular act can be considered part of the loading or unloading operation.

> [T]he pertinent inquiry is whether the acts of negligence charged to defendants were a part of the overall loading or unloading operation so that, in the commission of the negligent acts charged, defendants can be said to have been using the vehicle and thereby became additional insureds under the policy. In other words, did the negligent act which caused the injury or is alleged to have caused it constitute a part of the loading and unloading process?
>
> [*Id.* at 45, 262 *A.2d* 223.]

## B.

▪ Applying the structure for analyzing a claim for coverage in the "unloading and loading" context first set out in *Maryland*

*Casualty,* the critical issue is whether Jefferson's selection of the defective pallet was an integral part of the loading activity, and thus covered under the "use" provision. The injury occurred during unloading, but the negligent act occurred before the physical loading of the goods. Therefore, the question becomes whether selecting the pallet was an act in preparation of loading the vehicle or an unrelated act.

No party disputes that the injury occurred during the unloading process. *See supra* at 396, 688 *A.*2d at 90. Since New Jersey is a "complete operation" jurisdiction, we must determine whether the selection of the pallet falls within the complete operation of transporting the goods. All that is required is that the act which resulted in the injury was necessary to carry out the loading or unloading. *Drew, supra,* 90 *N.J.Super.* at 589, 218 *A.*2d 875.

NJM concedes that pallets were necessary to load the cargo onto the truck. In shipping, pallets are a common technique used to facilitate the movement of goods. Indeed, the pallet was selected in preparation for the loading and shipping of the cardboard. As in *Drew* where cleaning the clogged line to unload the acid became a necessary and integral part of the unloading activity, here the selection of pallets was necessary in order to load the goods onto North's trailer. As *Drew* states, there is no distinction between preparations for loading and the act of loading. *Drew, supra,* 90 *N.J.Super.* at 587, 218 *A.*2d 875. The selection of the defective pallet, therefore, was an integral part of the loading operation.

### C.

We reject NJM's argument that this case can be analogized to a line of cases denying coverage under the omnibus automobile-insurance clause, when the injury occurred as a result of negligent upkeep of, or defects on, the premises. The premises-liability cases deny coverage under the automobile policy for accidents occurring during loading and unloading activities because the accident arose not from the loading or unloading activities, but

from the negligent acts of the owner of the premises where the accident occurred, prior to the loading or unloading of the vehicle. *See, e.g., Forsythe v. Teledyne Turner Tube,* 209 *N.J.Super.* 608, 508 *A.*2d 1156 (App.Div.1986) (finding truck driver's injuries caused by defective docking plate during process of unloading not covered under truck's automobile liability policy); *Neuman v. Wakefern Foods,* 205 *N.J.Super.* 263, 266, 500 *A.*2d 752 (App.Div. 1985) (agreeing with trial court that accident not covered by automobile insurance policy, because alleged defect in design or maintenance of hand truck "not directly dependent upon the loading or unloading of the ... truck [but] ... more analogous to the independent negligence of the owner of the premises regarding maintenance of the loading platform"); *Wakefern Food Corp. v. General Accident Group,* 188 *N.J.Super.* 77, 84, 455 *A.*2d 1160 (App.Div.1983) (holding that "the cause of the accident, the hazardous condition of debris permitted by Wakefern to exist, was not, 'within reason,' a condition necessary to the act of unloading nor had it *any* reasonable connection to that work"); *Atlantic Mut. Ins. Co. v. Richards,* 100 *N.J.Super.* 180, 183, 241 *A.*2d 468 (Ch.Div.1968), *aff'd,* 105 *N.J.Super.* 48, 251 *A.*2d 134 (App.Div. 1969) (finding loading dock owner not covered under truck owner's automobile policy for death of truck driver while loading truck because "[t]o construe the maintenance of the loading platform as a 'use of the automobile' in unloading would be to extend automobile liability coverage to negligence occurring prior to the arrival of a truck, that is, failing to remove dunnage from proximity to the open stairwell, and to a nuisance grounded in negligence, that is, the stairwell without guardrail").

Even applying the legal reasoning in those cases, Jefferson would be covered by the NJM policy. *Atlantic Mutual, supra,* states that automobile liability coverage extends "to negligence in loading or unloading the automotive vehicle, including preliminary and subsequent measures proximate in time related to its loading or unloading." 100 *N.J.Super.* at 185, 241 *A.*2d 468. As did the Appellate Division in *Forsythe, supra,* we distinguish between

cases where there is negligence in the actual loading and unloading operation, such as by an employee of a warehouse in loading a truck, and those cases where the negligence is not directly related to the loading and unloading process, such as where there is a dangerous condition on the premises of the warehouse.

[209 *N.J.Super.* at 616, 508 *A.*2d 1156.]

Because the selection of the pallet was necessary and preliminary to the process of loading North's trailer, Jefferson is an additional insured under the NJM policy. That decision neither expands the scope of liability under "use" provisions nor limits the effect of the premises-liability cases. Instead, it follows the legal reasoning set forth both in the "loading and unloading" cases and the premises-liability cases.

### D.

■ In reaching that decision, we reject NJM's assertion that public policy necessitates finding that Jefferson is not covered by the North policy. Relying on the public policy rationale supporting the premises-liability cases, NJM contends that interpreting the omnibus clause to cover Jefferson "reallocates the ultimate financial risk for Jefferson's negligence, relieves Jefferson from any incentive to maintain its pallets in a safe condition, and inevitably results in increased premiums to the motor vehicle operator."

■ The Legislature mandated omnibus coverage for "loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of the ownership, maintenance, operation or use of an automobile." *N.J.S.A.* 39:6A–3; *see also N.J.S.A.* 39:6B–1. "Use" explicitly denotes "something other or more comprehensive than either maintenance or operation." *Bellafronte, supra,* 151 *N.J.Super.* at 382, 376 *A.*2d 1294; *see Indemnity Ins. Co. v. Metropolitan Casualty Ins. Co.,* 33 *N.J.* 507, 513, 166 *A.*2d 355 (1960) ("*Use* is ... broader than *operation.* ... One who operates a car uses it, ... but one can use a car without operating it."). Mandatory "use" coverage in New Jersey "must be broadly construed in order to effectuate the overriding legislative policy of assuring

financial protection for the innocent victims of motor vehicle accidents." *Bellafronte, supra,* 151 *N.J.Super.* at 382, 376 *A.*2d 1294. In *Ryder, supra,* referring to *Bellafronte,* we made clear our commitment to the "broad *scope* of coverage that an insurer must provide for accidents arising during loading and unloading." 119 *N.J.* at 408, 575 *A.*2d 416. Maintaining the broad scope of statutorily mandated automobile insurance coverage fosters, rather than offends, public policy.

Further, we do not agree with NJM's assertion that finding Jefferson covered by the omnibus liability clause increases the cost of insurance. For more than forty years, our courts have found coverage under "use" provisions where the negligent act was intimately connected with the loading and unloading process. Insurance companies have set their rates based on that interpretation of "use." To deny Jefferson coverage would be to change the interpretation relied on in this State by insurance companies in setting their rates.

Finally, we do not agree that our holding is inconsistent with *Cenno, supra.* Indeed, based on the standard for inquiry set forth by the *Cenno* court, *supra* at 400, 688 *A.*2d at 91–92, the selection of the pallet was an integral part of the loading process. In *Cenno,* the plaintiff, a truck driver, was injured while delivering a load of baled cardboard manufactured by the West Virginia Paper and Pulp Company (West Virginia). "The cardboard had been baled by West Virginia at its Hoboken plant using metal bands and clips manufactured by defendant Acme Steel Company." *Cenno, supra,* 109 *N.J.Super.* at 43, 262 *A.*2d 223. After arriving at the Allied Paper plant in Brooklyn, the plaintiff attempted to move one of the bales to the rear of the truck by pulling on the metal band securing the bale. The band broke, causing the plaintiff to lose his balance and fall out of the truck. *Id.* at 44, 262 *A.*2d 223. The Appellate Division found that West Virginia was not an additional insured under the comprehensive automobile-liability policy, on the grounds that the negligent banding of the bales did not "constitute a part of the loading or unloading

process." *Id.* at 45, 262 *A.2d* 223. It is unclear whether the cardboard was baled with metal bands solely to facilitate its shipment or whether that was a requirement of West Virginia's customer. If there had been a factual basis for concluding that the baling was done solely to enable shipment of the goods, the *Cenno* court would have found West Virginia to be an additional insured.

### III

The selection of the pallet was an act in preparation of and integral to the loading process. Therefore, Jefferson is an additional insured under NJM's policy. Accordingly, Jefferson's claim that North must indemnify it is moot.

The judgment of the Appellate Division is affirmed and the case is remanded for a determination of the reasonableness and good faith of Kennedy's $750,000 settlement with Jefferson.

O'HERN, J., dissenting.

I disagree that the defective condition in the shipper's loading pallet constituted a "use" of the trucker's vehicle that required the trucker's automobile insurance policy to indemnify the shipper for damages caused by the pallet's defective condition.

The essential predicate to find coverage under the truck policy is whether the negligent act of the party to be covered constituted a "use" of the motor vehicle. Motor vehicle insurance policies insure against damages arising out of the ownership, maintenance, or use of a vehicle. Under policy language or statutory requirement, the "use" of a vehicle includes the loading and unloading of a vehicle. In New Jersey, the obligation to provide coverage in a motor vehicle liability policy for loading and unloading operations derives from the statutes requiring insurance covering use of a vehicle and cannot be limited by contract. *N.J.S.A.* 39:6A–3; 39:6B–1. *See also Bellafronte v. General Motors Corp.,* 151 *N.J.Super.* 377, 376 *A.2d* 1294 (App.Div.), *certif. denied,* 75 *N.J.* 533, 384 *A.2d* 513 (1977).

Thus, when a defendant in a negligence action seeks coverage, "the pertinent inquiry is whether the acts of negligence charged to defendants were part of the overall loading or unloading operation so that, in the commission of the negligent acts charged, defendants can be said to have been using the vehicle and thereby became additional insureds under the policy." *Smithbower v. Navistar Int'l Transp. Corp.*, 265 *N.J.Super.* 119, 124, 625 *A.*2d 586 (App.Div.1993) (quoting *Cenno v. West Virginia Paper & Pulp Co.*, 109 *N.J.Super.* 41, 45, 262 *A.*2d 223 (App.Div.), *certif. denied*, 56 *N.J.* 99, 265 *A.*2d 149 (1970)). That the plaintiff may have been "using" the truck at the time he sustained his injuries is simply not relevant to the question of whether the act of defendant that caused his injuries was a use of the truck. *Halifko v. Cities Service Oil Co.*, 510 *F.Supp.* 1131, 1134 (D.N.J.1981), *aff'd*, 676 *F.*2d 684 (3rd Cir.1982). Our inquiry should focus on the act of negligence charged: whether Jefferson Smurfit was engaged in the loading or unloading of the truck when it selected or provided the defective pallet, not on whether Kennedy was engaged in unloading the truck at the time he was injured. In that latter instance the truck may have merely been the situs of the accident.

Assume that propane gas fumes had escaped from a leaking tank that had been loaded on the truck. If the leaking propane had caused an accident and injury while en route to its destination, would the shipper's act of negligence in defectively packing its product be considered a use of the vehicle? I should think not. Should it make a difference that the accident occurred during the unloading of the truck? Again, I think not. There is an insufficient relationship between the act of negligence charged and the act of loading and unloading.

This case is most similar to that involving a defect in a hand truck used in the loading and unloading operation. *Neuman v. Wakefern Foods*, 205 *N.J.Super.* 263, 500 *A.*2d 752 (App.Div.1985). A hand truck is a device that is used in the loading and unloading operation. A pallet is a device that is used in a loading and unloading operation. In *Neuman*, the accident and the plaintiff's

injuries resulted from a defect in an electric hand truck, which defect was allegedly due to improper design or improper maintenance. The *Neuman* court found no coverage under the trucker's policy for the party causing the defect in the hand truck. "That defect was not directly dependent on the loading or unloading of the ... truck." *Id.* at 266, 500 *A.*2d 752. Such an analysis is consistent with those cases that hold that a defective condition existing at the shipper's location at the time of the loading and unloading—due, for example, to negligent maintenance of a loading platform—is not a "use" of the vehicle within the scope of the vehicle owner's insurance coverage. *Atlantic Mutual Ins. Co. v. Richards,* 100 *N.J.Super.* 180, 241 *A.*2d 468 (Ch.Div.1968), *aff'd,* 105 *N.J.Super.* 48, 251 *A.*2d 134 (App.Div.1969). *See also Wakefern Food Corp. v. General Accident Group,* 188 *N.J.Super.* 77, 455 *A.*2d 1160 (App.Div.1983) (holding act of leaving debris on loading dock that caused accident not covered by vehicle insurance policy).

In contrast, when the act of negligence constitutes a use of the vehicle in the sense of actually loading or unloading a truck, the vehicle's insurance policy will provide coverage. *Parkway Iron & Metal Co. v. New Jersey Mfr's Ins. Co.,* 266 *N.J.Super.* 386, 629 *A.*2d 1352 (App.Div.1993), *certif. denied,* 135 *N.J.* 302, 639 *A.*2d 301 (1994) (holding negligent use of crane covered by vehicle's insurance policy); *see also Bellafronte, supra,* 151 *N.J.Super.* 377, 376 *A.*2d 1294 (holding negligent use of crane magnet during unloading constitutes use of vehicle). Thus in *Neuman, supra,* 205 *N.J.Super.* 263, 500 *A.*2d 752, had the operator of the hand truck negligently driven into the plaintiff, there would have been coverage under the trucker's policy.

The lines drawn are subtle and present varying ranges of difficulty in the proper determination of which liability insurance policy should cover the risk, the comprehensive general liability insurance of the shipper or the automobile liability insurance policy of the truck owner. One theory for allocating responsibility among liability insurance companies that provide overlapping cov-

erage for the same loss would require us to consider which risk-bearer was in the best position to avert the harm:

> [M]arket coordination aims at appropriate and efficient functioning of the industry, allocating responsibility based upon the risk undertaken by the insurer. If the market operates efficiently, primary responsibility for a loss will fall on the insurer who was in the best position to classify and rate the risks accepted. Such allocation guarantees that the insurer which receives premium payments most accurately reflecting insured risks also bears the loss. That insurer is also in the best position to predict loss. Appropriate allocation of loss thus increases accuracy in loss prediction, enhancing industry efficiency, with obvious benefits for insurance consumers in the form of lower costs, and for society generally in the form of added financial stability of the insurance industry. Misallocation of losses to insurers with less information about the risk causing loss ensures that actual losses will vary from predicted losses to a greater degree, upsetting the foundation of the industry.
>
> [Susan Randall, *Coordinating Liability Insurance,* 1995 *Wis. L.Rev.* 1339, 1368 (footnotes omitted).]

Obviously, the party with the most information about the risk of defect in a pallet was Jefferson Smurfit and Jefferson Smurfit's insurance company was in the best position to assess the risks relevant to that conduct.[1] In the usual straightforward loading and unloading case, the trucker is present at the time of loading and unloading and has some ability to manage the risk at the scene by observation of the loading and unloading operations and by intervention if an actor does not exercise due care during the loading or unloading of the vehicle. In this case, the trucker had absolutely no ability to control the risk from the defective pallet.

In *Cenno,* one of the earliest loading and unloading decisions of New Jersey and one almost identical to this, a truck driver was delivering a load of baled cardboard. While attempting to pull a bale from the rear of the truck, the band securing the bale came apart and injured the truck driver. The shipper of the goods sought coverage as an additional insured under the motor vehicle liability policy issued by the trucker. The court's opinion by Justice Sullivan, then sitting in the Appellate Division, stated: "The policy affords coverage as an additional insured to one while

---

[1] In this case, the shipper, Jefferson Smurfit, was in fact self-insured for these risks.

*using* the vehicle and specifies that ... 'use of an automobile includes the loading and unloading thereof.'" *Cenno, supra,* 109 *N.J.Super.* at 45, 262 *A.*2d 223. The court concluded that because the commission of the negligent act (the provision of a defective baling band) did not occur during the use of the vehicle, the shipper could not be considered an additional insured for an act that preceded the loading and unloading of the vehicle.

So too here. The negligent act of providing a defective pallet did not occur during the use of the vehicle. The negligent act occurred at Jefferson Smurfit's facility. The North truck, therefore, became the situs of the damage due to a prior negligent act.

We thus have in this case an accident that was not causally connected with the loading and unloading, but merely occurred during it. The person charged with the negligent act is not to be considered to have been using the vehicle so as to be covered by the vehicle's liability policy for such act as an additional insured.

*For affirmance and remandment*—Justices HANDLER, GARIBALDI, STEIN and COLEMAN—4.

*Opposed*—Justice O'HERN and Chief Justice PORITZ and Justice POLLOCK—3.