188 N.J. Super. 77 (1983)
455 A.2d 1160
WAKEFERN FOOD CORPORATION, PLAINTIFF-RESPONDENT,
v.
GENERAL ACCIDENT GROUP, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1982.
Decided January 28, 1983.
*78 Before Judges KING and McELROY.
Jack A. Maloof argued the cause for appellant (Matthew J. Connahan on the brief).
Susan L. Moreinis argued the cause for respondent (Philip M. Lustbader and David Lustbader, attorneys).
The opinion of the court was delivered by McELROY, J.A.D.
This appeal by defendant automobile insurance carrier again raises the issue of the nature, extent and purpose of the "use" and "loading and unloading" provisions of motor vehicle insurance policies. See Maryland Cas. Co. v. N.J. Mfrs., etc., Ins. Co., 48 N.J. Super. 314 (App.Div. 1958), aff'd 28 N.J. 17 (1958); Drew Chem. Corp. v. American Fore Loyalty Group, 90 N.J. Super. 582 *79 (App.Div. 1966); Atlantic Mut. Ins. Co. v. Richards, 100 N.J. Super. 180 (Ch.Div. 1968), aff'd 105 N.J. Super. 48 (App.Div. 1969); Cenno v. West Virginia Paper & Pulp Co., 109 N.J. Super. 41 (App.Div. 1970), certif. den. 56 N.J. 99 (1970); Bellafronte v. General Motors Corp., 151 N.J. Super. 377 (App.Div. 1977), certif. den. 75 N.J. 533 (1977); Streeter v. Henry Heide Inc., 171 N.J. Super. 58 (App.Div. 1979); Halifko v. Cities Service Oil Co., 510 F. Supp. 1131 (D.N.J. 1981), aff'd 676 F.2d 685 (3 Cir.1982).
The process of law and its theories of rights and liabilities spring from and govern prosaic events, and this case presents no exception. Here a July 9, 1979 delivery of a trailer load of refrigerated orange juice to the unloading dock of Wakefern Food Corporation (Wakefern) at Elizabeth, New Jersey, by Harold Ruby, truck driver for Citrus Bowl Inc. (Citrus), was the instigating event giving rise to this recurring and vexatious insurance coverage issue. Unfortunately for Ruby, the delivery area where he was obliged to place and leave his trailer was maintained in less than good condition by Wakefern. Thus, while walking between his trailer and another Ruby was injured when he stumbled over items he described as "debris" where he reasonably was expected to perform his work.
Ruby was required to back his trailer into a place in the dock area where it could be left for eventual unloading by Wakefern. Because the trailer was refrigerated, Ruby was obligated to hook up an electrical cable, supplied by Wakefern, to a wall socket of the dock and run it back to an outlet on his trailer to provide current for its refrigerating unit.
Ruby's deposition revealed that he placed his trailer at the dock and found a cable in working condition; he indicated "most of them are broke." This one he plugged into Wakefern's wall socket and as he turned around to carry the other end to his trailer his foot caught in debris consisting of "a pallet, cardboard and excess wires." In answer to an interrogatory he indicated:
This pallet was partially broken where you could see it was just [hanging] together with nails. There were also many electrical cord hookups that go into refrigerated trailers laying on the ground and a piece of metal that looked like it *80 was squashed by a truck laying there. I don't remember whether it was the wooden pallet, electrical wires or piece of metal that caused me to trip and fall. These items were so positioned and intertwined or overlapped each other that I could not differentiate as to what caused me to trip.
The tractor trailer owned by Citrus and operated by Ruby was insured by appellant General Accident Fire & Life Insurance Corp, Ltd. (General Accident) under a "Business Auto Policy." When Ruby sued Wakefern for its negligent maintenance of the unloading area Wakefern claimed it was an additional insured and demanded defense and indemnity of General Accident. Upon refusal, Wakefern brought this suit for a declaratory judgment against General Accident.
General Accident filed an answer denying that its policy covered Wakefern and moved for summary judgment. The parties agreed that the facts were not in dispute and the trial judge treated the matter as one presenting cross-motions for summary judgment. After oral argument the judge held that General Accident was obliged to defend and insure Wakefern. The judge's brief opinion follows:
THE COURT: All right, I understand your argument but I do find your company is looking at their policy too technically. Policy is designed to cover someone who's loading or unloading and it's all part of the same loading or unloading process that this man was hurt. I can see if he got back in his truck, shut his motor off, went down to the end of the pier, smoked a cigarette, fell in the river, that's one thing but here he was doing what he was supposed to do; that's when he was hurt. that's covered. Submit an Order.
General Accident's policy is drawn in language intended to be easily understood and its format breaks down into sections intentionally labeled for reading and comprehension by an insured who lacks legal training. It defines "autos" as meaning "a land motor vehicle, trailer or semi-trailer designed for travel on public roads." Other controlling provisions are these. Under Part IV, "Liability Insurance," the policy states:
A. WE WILL PAY.
1. We will pay all sums the insured legally must pay as damages for bodily injury ... to which this insurance applies, caused by an accident and resulting from the ownership, maintenance of use of a covered auto. [Emphasis supplied.]
2. We have the right and duty to defend any suit asking for these damages....
........

*81 C. WE WILL NOT COVER  EXCLUSIONS.
This insurance does not apply to:
........
7. Bodily injury ... resulting from the loading of property before it has been put in or on the covered auto or the unloading of property after it has been taken off or out of the covered auto....
D. WHO IS INSURED.
1. You are insured for any covered auto.
2. Anyone else is an insured while using with your permission a covered auto you own.... [Emphasis supplied.]
Clearly, this policy provides coverage for defense and indemnification to its named insured (not here involved) and extended coverage to "anyone else" legally liable for bodily injury "caused by an accident and resulting from the ... use of a covered auto." Under the policy the use must be with the permission of the named insured. Loading or unloading of a covered auto is intended to be covered under Part IV C, subsection 7, unless the bodily injury results from "the loading of property before it has been in or on the covered auto or the unloading of property after it has been taken off or out of the covered auto." This particular phrasing suggests the scrivener's intent to avoid, at least in part, any application of the "completed operation" approach to resolution of the problems usually attendant to loading and unloading cases. Thus, he attempts to exclude his carrier's liability for unloading where the property being unloaded has been "taken off or out of the covered auto." Fortunately, because of the particular facts of this case, we need not open that can of worms and examine the creatures he has attempted to add to the contents of the usual loading and unloading clause. Nor do we have to attempt to determine if the clause is valid under settled New Jersey law.
For the moment it is sufficient that we observe that the courts of this country are of diverse minds as to the interpretation to be applied to ordinary loading and unloading clauses. See Annotation, "Risks within `loading and unloading' clause of motor liability insurance policy," 95 A.L.R.2d 1122 (1964), updating 160 A.L.R. 1259 (1946). See 6 A.L.R.4th 686 (1981) for the *82 most recent update. The principle line of demarcation divides those courts applying the "coming to rest" doctrine from the majority of courts opting for the "complete operation" principle. The former doctrine is restrictive and applies coverage only where the accident is causally related to "the actual removal or lifting of the article from the motor vehicle up to the moment when the goods which are taken off the motor vehicle actually come to rest and every connection of the motor vehicle with the process of unloading ceases." 95 A.L.R.2d at 1129. New Jersey applies the "complete operation" doctrine. Drew Chem. Corp. v. American Fore Loyalty Group, etc., supra, 90 N.J. Super. at 587. In Drew Judge Goldmann observed:
... [T]he "complete operation" doctrine has been said to cover the entire process involved in moving the goods, from the moment they are given into the insured's possession until they are turned over at the place of destination to the party to whom delivery is to be made. 12 Couch on Insurance (2d ed. 1964), § 45:128, pp. 197-198. We consider this doctrine as the more modern and enlightened one, supported by the weight of authority. See 95 A.L.R.2d, at pp. 1130 and 1134. It was clearly approved in the Maryland Casualty Co. case. As we said there, the "loading and unloading" clause is one of extension, expanding the meaning of the phrase "while using the automobile." The merit inhering in this view is that it reflects the reasonable contemplation of the parties. [at 586-587]
Drew is advanced to us by Wakefern as an analogous case controlling the approach here to be taken. We disagree. The case is distinguishable. In that case Byford, an employee of Nappi, drove the latter's tank truck to Drew's premises to deliver a load of fatty acid liquid and transfer it, through a hose supplied by Nappi as part of the truck's equipment, from the truck to Drew's storage tank. Evans, a Drew employee, coupled the hose to the truck and the pipeline of the storage tank but when a pump was started no acid flowed. Evans believed that the Drew pipeline was clogged and instructed Byford to uncouple the hose from the truck. Byford did so and placed the truck end of the hose in an open ditch. Evans unsuccessfully attempted to clear the line using air pressure and then ran steam under pressure through the line. This action caused the hose to whip around, striking Byford and injuring him. This court held that Drew was covered by Nappi's automobile insurance carrier *83 under the "use" and "unloading" clauses of its policy. In so doing it noted that the "scope of the `complete operation' doctrine can only be determined in a particular context." Id. at 587. This court also refined its earlier holding in Maryland Cas. Co. v. N.J. Mfrs. Ins. Co., supra, 48 N.J. Super. at 320, which required in each case a finding of causal connection between the unloading operation and the accident. Unfortunately, Judge Goldmann in Maryland had, in passing, used the phrase "efficient cause," a term of causal relationship having application to a determination of negligence rather than resolution of a coverage issue. In Drew he was therefore obliged to refine "more accurately" the approach to be adopted in unloading cases. He held:
In determining the existence of a causal connection, the proper approach is to consider whether the accident was, within reason, causally connected with the complete operation of unloading the Nappi truck. [90 N.J. Super. at 591. Emphasis supplied.]
Judge Goldmann then made the following analysis of the facts before the court:
While the act of clearing the line was normally not a part of the unloading operation, it was, under the existing circumstances, a necessary one. The presence of the clogged line led to Evans taking a reasonable step in helping to unload the tank truck, and this with the implied permission of Byford, the driver. In short, the process of unloading the acid necessitated the very act (the clearing of the line) which, in turn, caused the accident. [at 591]
We find no comfort to Wakefern in Drew. We do not read its holding as suggesting that a causal relationship, in a coverage sense, must be found in every case where an accident occurs in the process of unloading. That is not the view adopted by our courts. We observed in Cenno v. West Virginia Paper & Pulp Co., supra, 109 N.J. Super. at 45, that "[t]he policy does not embrace all accidents happening during the loading and unloading of the truck regardless of causation." The Drew requirement is that accidents must "within reason" be causally connected with the complete operation of unloading. In the instant case, although Ruby's presence at the unloading area and his act of connecting the electric cable to his trailer were obviously related, in the required causal sense, to the unloading operation *84 to be performed, the cause of the accident, the hazardous condition of debris permitted by Wakefern to exist, was not, "within reason," a condition necessary to the act of unloading nor had it any reasonable connection to that work. It taxes the limits of judicial imagination and impoverishes that necessary decisional quality to contemplate that a needless accumulation of debris, a simple violation of Wakefern's duty to its invitees, has any realistic nexus to the unloading process.
We are mindful of this court's decision in Streeter v. Heide Inc., 171 N.J. Super. 58 (App.Div. 1979), a case where the "complete operation doctrine" was, in a terse opinion, applied with a broad brush. We see no reason to take such an approach in this case. Streeter is distinguishable. The placement of the malfunctioning loading dock plate was "an integral part of the loading operation." To that extent, the malfunctioning dock plate may be said to "within reason" have a causal relationship to the loading process, just as the clogged and malfunctioning pipeline involved in Drew, supra, had a causal connection to that unloading operation. The same cannot be said of the debrisstrewn dock area maintained by Wakefern and furnished to its invitees. The negligent accumulation of debris in a delivery area is hardly a "use" of the vehicles that come to those premises.
The ultimate question in any loading or unloading case is whether the putative insured is "using" the covered vehicle, for it is from this contractual or statutory root that coverage during loading or unloading stems. See Bellafronte v. General Motors Corp., supra, 151 N.J. Super. at 381-385; N.J.S.A. 39:6B-1.
In Cenno v. West Virginia Paper & Pulp Co., supra, 109 N.J. Super. at 47, we held:
In summary, we conclude that unless the alleged negligent act which is alleged to have caused the accident was an integral part of the overall loading or unloading operation, so that the mishap is causally connected with such loading and unloading and did not merely occur during it, the person charged with the negligent act is not considered to have been using the vehicle so as to be covered by the vehicle's liability policy for such act as an additional assured. Couch, supra, § 45:136, at 204. [Emphasis supplied.]
*85 In Cenno the negligent act charged to the parties claiming as insureds under the automobile policy predated the delivery of the goods, although the accident occurred during delivery. The same type of factual complex is presented by the debris Wakefern here accumulated and left about. In these circumstances we find more compelling the approach taken by Judge Furman, then sitting in the Chancery Division, in Atlantic Mut. Ins. Co. v. Richards, supra, affirmed by this court in 105 N.J. Super. 48 (App.Div. 1969). In Atlantic Richards was unloading a 50-pound bag of Bentone from the truck of his employer, National Lead Company, at the loading platform of Sapolin Paints, Inc. He died as a result of a fall down an unguarded stairwell located in the loading platform. The reasonable inference was that his fall was occasioned by tripping over a three-foot slat of wooden dunnage not used in connection with the unloading process. The dunnage had been carelessly left on the platform by Sapolin. Judge Furman ruled, and this court agreed, that National Lead's vehicle policy did not provide coverage to Sapolin for a suit brought by Richards' widow based upon Sapolin's failure to provide Richards with a safe place to work. In so holding Judge Furman observed:
The regular inspection of the loading platform, the remedying of a hazardous condition or the communication of an adequate warning may be viewed broadly as necessary for safe unloading. But the fulfillment of such duty was not a step in the specific operation of unloading the National Lead truckload. To construe the maintenance of the loading platform as a `use of the automobile' in unloading would be to extend automobile liability coverage to negligence occurring prior to the arrival of the truck, that is, failing to remove dunnage from proximity to the open stairwell, and to a nuisance grounded in negligence, that is, the stairwell without guardrail. No New Jersey reported opinion has so held. [100 N.J. Super. at 183]
........
Implicit in Atlantic Mutual's argument is that certainty in resolving insurance coverage disputes can be achieved by imposing liability on the automobile liability carrier whenever the accident occurred during loading or unloading. According to this argument, the particular tort charged may be contingent on the vagaries of pleading. For example, in Richards versus Sapolin Paints, Inc. an additional count might have been added for negligence in directing the delivery truck to an unsafe area of the loading platform. Whether recovery is on a count for negligence in maintenance or on a count for negligence in the *86 process of loading or unloading may hinge on an election between inconsistent factual theories at the time of trial (see Ajamian v. Schlanger, 14 N.J. 483, 490 (1954); Shapiro v. Solomon, 42 N.J. Super. 377, 386 (App.Div. 1956), or both counts may go forward to the jury as negligent acts or omissions which may have contributed independently to the proximate causing of the accident.
Although some trial problems are foreseeable because of initial uncertainty and the resolution of the insurance coverage dispute may require special interrogatories (R.R. 4:50-2), the sounder result favored by most courts is that automobile liability insurance under a loading and unloading clause should not cover damages sustained as a result of negligent maintenance of the premises where the loading or unloading was carried out. The risk insured against should be limited to negligence in loading or unloading the automotive vehicle, including preliminary and subsequent measures proximate in time related to its loading or unloading. [Id. at 185]
We find equally persuasive the rationale used by Judge Debevoise in Halifko v. Cities Service Oil Co., 510 F. Supp. at 1136-1137, supra, where he observed:
Sound policy considerations weigh strongly against construing an omnibus clause to cover the owner of a loading platform on which a named insured is injured solely due to an unsafe condition on the premises. Such an interpretation would reallocate the ultimate financial risk of the platform owner's negligence to the truck driver's insurance company. This reallocation, in turn, would inevitably result in increased insurance premiums to the motor vehicle operator. As a consequence, the owner of a plant or warehouse at which trucks are unloaded would be freed from a financial incentive to maintain his premises in a safe condition. Truck owners and operators, who exercise little or no control over the premises on which they unload, would be forced to bear the entire financial burden of accidents resulting from platform owners' lack of care.
........
The possibility that some negligent platform owners might be both uninsured and judgment-proof is not a sufficient justification for shifting the financial risk of injuries arising from unsafe property conditions from property owners to the motor vehicle insurance buying public.
We feel constrained to observe pragmaticably that declaratory judgment suits like the present one are, by large measure, solely between an automobile insurance carrier and a general liability carrier who covers the premises and operations liability of a business to whom goods are delivered or from whom goods are taken. One of the purposes for which the latter coverage is purchased is to protect the business operator from the risk of liability to his invitees resulting from the negligent maintenance of his premises. "Use" provisions and *87 "loading and unloading" clauses are intended to protect the named insured and others who, in the pick-up or delivery process, are actually using the motor vehicle and its contents during the "complete operation." When an accident, such as the one here presented, is occasioned by negligent maintenance of the premises and the only connection to that event is the fact that the motor vehicle and its operator are present because a delivery or pick-up is to be made, no realistic social or public policy is served by straining to shift coverage. Moreover, no reasonable contractual expectations are disappointed or denied and the "reasonable contemplation of the parties" mentioned in Drew, supra 90 N.J. Super. at 587, is hardly placed at hazard.
Accordingly, the judgment entered in the trial court in favor of Wakefern is reversed and judgment in favor of defendant-appellant General Accident is entered.