752 A.2d 819 (2000)
332 N.J. Super. 53
John CRAGGAN, Jr., Plaintiff-Appellant/Cross-Respondent,
v.
IKEA USA, Defendant-Respondent/Third-Party Plaintiff/Cross-Appellant.
Ultimate Services, Inc. Defendant-Respondent,
v.
Reliance National Indemnity Company, Third-Party Defendant-Respondent, and
Alexander & Alexander of California, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted May 9, 2000.
Decided June 15, 2000.
*820 Baer, Arbeiter, Ploshnick, Tanenbaum & Weiss, Metuchen, for plaintiff-appellant/cross-respondent John Craggan, Jr. (Steven M. Tanenbaum, on the brief).
Fitzpatrick, Reilly, Supple & Gaul, New Providnce, for defendant-respondent/third-party plaintiff/cross-appellant IKEA USA (Joseph A. Campbell, Jr., on the brief).
Parker & Wolfson, Flemington, for third-party defendant-respondent Reliance National Indemnity Company (John R. Parker, of counsel and on the brief).
Chapman, Henkoff, Kessler, Peduto & Saffer, Roseland, for defendant-respondent Ultimate Services, Inc. (Isaac Henkoff, of counsel and on the brief).
Before Judges CUFF and LESEMANN.
The opinion of the court was delivered by CUFF, J.A.D.
Following two days of trial, plaintiff's claim against defendants IKEA USA (IKEA) and Ultimate Services, Inc. (USI), IKEA's janitorial service, was dismissed at the close of plaintiff's case. The trial judge found that plaintiff had failed to submit any evidence of actual or constructive notice of the condition which caused his fall. At the same time, the trial judge ruled in favor of Craggan Trucking, Inc.'s insurance carrier, third-party defendant Reliance National Indemnity Company (Reliance), in IKEA's declaratory judgment action seeking indemnification. We reverse the involuntary dismissal of plaintiff's *821 claims against defendants and remand for trial. We affirm the order in favor of third-party defendant Reliance.
Plaintiff John Craggan, Jr. is an independent contractor delivering home furniture and other related items to customers pursuant to contracts with home delivery service companies. He has owned Craggan Trucking, Inc. since 1990. In 1993, plaintiff entered into a contract with Merchants Home Delivery Service which served defendant IKEA. By early 1995, plaintiff was delivering almost exclusively for IKEA.
Around the end of February or beginning of March 1995, a delivery pick up and loading method was implemented at IKEA. Generally, plaintiff would pick up "knock down goods" (unassembled furniture that comes inside a flat box), as well as sofas, mattresses and chairs to deliver to customers who bought the goods. IKEA had a customer pick up area in the parking lot with an overhang to protect the merchandise from the outside elements. The merchandise was staged on pallets in these areas for pick up.
The loading area contained removable and stationary metal railings positioned to prevent cars from entering under the canopy area where the contractors load their trucks. Near the stationary railings are approximately ten to twelve yellow boxes, which contain string to assist customers in securing merchandise in the trunk or on the roof of their cars. Plaintiff claimed he never used the string when loading his truck and had never observed other truck drivers or their assistants use the string. Plaintiff asserted that truckers have "no use for that string" because they do not "tie down anything"; if anything needs to be tied down, truckers use nylon webbing in the form of straps.
Plaintiff usually loaded and delivered approximately sixteen to twenty pallets of merchandise on any given delivery day. When loading, plaintiff removed nylon strapping and cellophane placed on the pallet to secure the merchandise. This strapping and cellophane material was discarded in rolling garbage cans located around the loading area. Plaintiff was one of approximately a dozen other contractors who picked up and delivered merchandise for IKEA. Often, IKEA personnel were present moving merchandise into the loading area via forklift. Plaintiff asserted that ordinarily neither IKEA nor USI personnel cleaned the loading area while trucks were loading.
On July 18, 1995, plaintiff arrived at IKEA with his driver and assistant, Tim Dugan, around 6:05 a.m. for a pick up. Upon arrival, plaintiff spoke with Luke Dempsey, an IKEA supervisor, to take care of paperwork. Plaintiff then directed Dugan where to park the truck for loading. Plaintiff claimed that he was one of the first trucks to arrive at IKEA that morning. Plaintiff had approximately seventeen pallets of furniture to load that day. Plaintiff explained the loading process: he would remove the strapping and cellophane from the merchandise with a razor knife, place the removed materials into the garbage bin, lift the item from the pallet onto his shoulder and hand it up to Dugan who was in the truck organizing the merchandise for delivery.
Around 6:30-6:40 a.m., while loading the eighth piece of merchandise into his truck, plaintiff fell. He claimed he picked up the merchandise from the pallet, placed it over his shoulder, took two steps and "felt something restrict [his] feet" causing him to fall. As he fell, he collided with portable railings leaning against the overhang. His right leg became "situated" between the two railings. Once on the ground, plaintiff realized his feet were entangled in the string from the yellow boxes left out for customer use. About thirty feet of the string was outside the box, coiled loosely in a ball resting about six to seven feet to the right of the truck. He claimed he did not notice any string in the area outside that yellow box where he was loading prior to his fall. He also admitted *822 that he had "absolutely no idea how long or when that string came onto the ground." He had not used the box of string, nor had he observed anyone else use the box of string that morning.
Dugan, who participated in the loading process that day, did not observe the string prior to plaintiff's fall. In fact, Dugan did not observe plaintiff fall; he was inside the truck organizing the merchandise. Rather, he heard a "clang," "crash," and "yelling," ran to the back of the truck and saw plaintiff on the ground with his feet entangled in string and his legs wedged between railings which had fallen.
At trial, plaintiff also introduced deposition testimony of defendant USI's executive vice president, Richard J. Goldring. Goldring was the USI site supervisor for IKEA. He testified that USI provided janitorial services to IKEA and was responsible to clean and inspect the customer loading area. Typically, USI came to IKEA around 7:30 a.m. to clean and sweep the loading area after the early morning rush of merchandise pick-ups. USI then returned after 7:30 p.m. that same day and stayed until closing to clean and do a final sweep and inspection of the area between 9 and 9:30 p.m. Goldring testified only as to the general process of the services provided. There was no testimony concerning the condition of IKEA's loading area the night before plaintiff's accident, or the cleaning activities actually performed the night prior.
After the close of plaintiff's case, defendants moved for an involuntary dismissal pursuant to R. 4:37-2(b). Defendant IKEA argued that in order for it to be liable for negligence, it had to have notice that the string was loose in the loading area and created a dangerous condition for independent contractors or customers. It argued that plaintiff failed to make a prima facie case that defendant had either actual or constructive notice of a dangerous condition. Defendant USI joined in the motion for involuntary dismissal. It argued that plaintiff failed to present evidence which could create an inference that USI failed to perform or negligently performed its janitorial services.
Plaintiff responded he did not have to prove notice because this is a "mode of operation" case and the presence of the string was a mode of IKEA's operation because it was there to facilitate the removal of merchandise by customers. Plaintiff contended that because "he didn't have a choice where to work[,] ... [and because] this is a workplace where [he] had no control over what was given to him, in terms of the area where he was to work," that a "reasonable inference" could be drawn that the string preexisted his arrival to the loading area, and this case should proceed. Further, plaintiff asserted that IKEA did have notice of dangerous conditions because plaintiff had complained on several occasions to the IKEA manager about conditions and debris in the loading area. With regard to USI, plaintiff argued the testimony created "at least [an] inference" that USI failed to do what it was supposed to do after the IKEA customers left the night before the incident.
The trial judge granted defendants' motion for involuntary dismissal finding plaintiff failed to demonstrate defendants had actual notice of a dangerous condition. In her oral decision, the trial judge stated that
[defendants] very simply discussed the issues that arethat have not been answered in plaintiff's case. How did the string get there? How long has ithow long was it there? None of those things were answered. By virtue of [plaintiff's] own testimony, he does not recall whether the string was there or not there when he got there. He doesn't know, and did not see the string until his fall. We have nothere has been no other testimony as of this time about the string beingnotice about the string being dangerous. There's been some scant testimony that [plaintiff] says that he complained about the string somewhere between four and six times;

*823 however, he had a long course of employment while working at IKEA. So whatthat testimony doesn't give us any basis of time, place.
The trial judge also found plaintiff failed to demonstrate defendants had constructive notice of a dangerous condition created by the existence and placement of the string. She opined that plaintiff would have had to present "expert testimony about the creation of these string boxes and poles ... the placement as such ... [and] how the string interferes or playsmakescreates a dangerous condition, and gives constructive notice of dangerous condition by virtue of where they are placed." She concluded that an involuntary dismissal was appropriate because all plaintiff proved was that he fell, not that he fell due to defendants' negligence. She did not address plaintiff's mode of operation argument.

I
A motion pursuant to R. 4:37-2(b), "shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." See Geldreich v. American Cyanamid Co., 299 N.J.Super. 478, 489, 691 A.2d 423 (App.Div.1997). In reviewing a motion for involuntary dismissal, the trial court must accept "as true all the evidence which supports the position of the party defending against the motion" and accord that party "the benefit of all inferences which can reasonably and legitimately be deduced" from the evidence. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). "[T]he judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only its existence, viewed most favorably to the party opposing the motion." Id. at 5-6, 258 A.2d 706.
The standard of appellate review is the same standard applied by the trial court. Tannock v. New Jersey Bell Tel., 223 N.J.Super. 1, 6, 537 A.2d 1307 (App. Div.1988). Therefore, this court "must examine the evidence, together with legitimate inferences which can be drawn therefrom, and determine whether the evidence could have sustained a judgment in favor of the party who opposed the motion." Ibid. Applying this standard, we conclude that the motion should have been denied. Accordingly, we reverse and remand for a new trial.
Although plaintiff argues he adduced sufficient evidence for a jury to conclude that defendants had actual or constructive knowledge of a dangerous condition in the loading zone, he also contends he was not required to prove notice of the condition because of the mode of operation selected by IKEA. We agree.
Since the advent and proliferation of self-service merchandisers, this State has recognized that notice, actual or constructive, of a dangerous condition is not required when the shopkeeper, through acts of its agents or patrons, creates a dangerous condition. Wollerman v. Grand Union Stores, 47 N.J. 426, 429-30, 221 A.2d 513 (1966); Smith v. First Nat'l Stores, 94 N.J.Super. 462, 466, 228 A.2d 874 (App. Div.1967); Torda v. Grand Union Co., 59 N.J.Super. 41, 45, 157 A.2d 133 (App.Div. 1959). In Wollerman, the Court focused on the operator's duty when it displayed vegetables for sale in open bins. The Court held:
When greens are sold from open bins on a self-service basis, there is a likelihood that some will fall or be dropped to the floor. If the operator chooses to sell in this way, he must do what is reasonably necessary to protect the customer from the risk of injury that mode of operation is likely to generate; and this whether the risk arises from the act of his employee or of someone else he invites to the premises. The operator's vigilance must be commensurate with that risk.
[Wollerman, supra, 47 N.J. at 429, 221 A.2d 513 (citations omitted).] *824 Earlier, in Torda, supra, this court discussed a shopkeeper's duty towards its patrons when it displayed produce on beds of ice. We said:
While there was no direct proof as to the fact, it was legitimately inferable that the source of the water on the floor was the ice-filled bin. Thus ..., evidence of how the hazard came into being was not left in a state of equipoise.
Defendant argues that it was inferable that the water fell to the floor as the result of the handling by the customers of wet vegetables which they had taken from the bin. We accept this premise.... [T]he fact finders might reasonably have concluded that the hazard to business invitees, thus engendered, constituted a risk of harm within the reasonable foresight of defendant and therefore it should have employed a method of refrigeration to obviate this danger or should have taken other means of keeping the floor in a reasonably safe condition.
[59 N.J.Super. at 45, 157 A.2d 133 (citations omitted).]
Recently, this same principle was applied in O'Shea v. K Mart Corp., 304 N.J.Super. 489, 701 A.2d 475 (App.Div. 1997). In O'Shea, a customer was injured in defendant's discount self-service store when a golf bag stored on an upper shelf fell on plaintiff and caused a significant facial injury. We held that the plaintiff was not required to provide evidence of notice of a dangerous condition when the defendant has an affirmative duty "to not only discover and eliminate any possible dangerous conditions or circumstances ... but also to keep the premises reasonably safe and not create any condition which renders the premises dangerous." Id. at 492-93, 701 A.2d 475. We further stated that whatever method of operation is adopted by an operator of a store it " `is under a duty to take reasonable measures to guard against injuries to customers.' " Id. at 493, 701 A.2d 475 (quoting Francois v. American Stores Co., 46 N.J.Super. 394, 398, 134 A.2d 799 (App.Div.1957)).
The dangers presented in Wollerman, Torda and O'Shea are analogous to the danger encountered by plaintiff. Each operation allowed merchandise to cause an injury to a person using the premises. To be sure, the danger created in Wollerman, Torda, and O'Shea occurred in the context of display of the merchandise, while the danger in this case arose in the context of removing the merchandise from the premises. The unifying factor, however, is a mode of operation designed to allow the patron to select and remove the merchandise from the premises without intervention from any employee of the storekeeper. We perceive no difference between the standard of care owed to the patron by the storekeeper in the display of merchandise and the removal of merchandise from the store. By providing string for patrons to use to secure merchandise to a car, truck or roof and placing that string in the same area used by commercial delivery personnel, defendants were required to recognize that patrons may be careless in the use of the string and might be less than diligent about preventing an accumulation of string in the loading area.
Defendant seeks to avoid this rule by referring to plaintiff's status as an independent contractor. IKEA argues there is an exception carved out of its duty to protect business invitees as it pertains to independent contractors "because the landowner may assume that the independent contractor and h[is] employees are sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety." Accardi v. Enviro-Pak Sys. Co., 317 N.J.Super. 457, 463, 722 A.2d 578 (App.Div.), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999); Dawson v. Bunker Hill Plaza Assocs., 289 N.J.Super. 309, 318, 673 A.2d 847 (App.Div.), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996). While this is an accurate statement of the law, it is inapplicable to this case.
*825 In Dawson, the plaintiff was an employee of the firm hired to install roof trusses. He was injured when the roof trusses collapsed due to inadequate bracing. Id. at 319, 673 A.2d 847. The danger of collapse was a recognized risk of the task for which plaintiff was engaged. Ibid. Here, however, plaintiff was not injured by a condition created by his task or a risk inherent in his work. Plaintiff was injured by conditions in the loading area implemented by IKEA to facilitate removal of merchandise by patrons who had elected to transport merchandise in their own vehicles. IKEA's mode of operation to facilitate selfservice removal of purchased items created a reasonable probability that the string would not be properly coiled in its container after each use, would accumulate in the loading area, and create a tripping hazard for anyone using the area. Accordingly, we reverse the order dismissing plaintiff's complaint and remand for a new trial.

II
Having concluded that the complaint should not have been dismissed against IKEA, it was also error to dismiss the complaint against USI. A cross-claim for contribution existed between defendants.[1] Under the circumstances, any motion for dismissal by USI must abide the close of all evidence. R. 4:37-2(c).

III
In response to plaintiff's complaint, IKEA also filed a third-party complaint against plaintiff's commercial trucking commercial trucking insurer, Reliance. It alleged that Reliance breached its contract of insurance in which IKEA was named as an additional insured through its refusal to assume the defense of plaintiff's claim and to hold IKEA harmless. This claim was not severed and it was not disposed of prior to trial. Rather, after the trial judge granted defendants' motions for involuntary dismissal, it adjudicated IKEA's claim against Reliance and ruled in favor of Reliance. This ruling is the subject of IKEA's cross-appeal. We affirm.
An obligation to provide coverage to an additional insured, like defendant IKEA, arises from the express language in the insurance contract, Ryder/P.I.E. Nationwide, Inc. v. Harbor Bay Corp., Inc., 119 N.J. 402, 406-07, 575 A.2d 416 (1990), as well as statutory law governing the loading and unloading of motor vehicles. Bellafronte v. General Motors Corp., 151 N.J.Super. 377, 382-84, 376 A.2d 1294 (App.Div.), certif. denied, 75 N.J. 533, 384 A.2d 513 (1977); see also N.J.S.A. 39:6b-1 (Compulsory Motor Vehicle Insurance Law mandating every owner of a motor vehicle maintain liability insurance for loss "arising out of the ownership, maintenance, operation, or use of the vehicle.") (emphasis added). It is wellsettled that the concept of "use" involves all acts, including preparation, of the loading and unloading process. Ryder/P.I.E., supra, 119 N.J. at 407, 575 A.2d 416.
The parameters for determining coverage for various loading and unloading activities was first explored in Maryland Cas. Co. v. New Jersey Mfrs. Ins. Co., 48 N.J.Super. 314, 137 A.2d 577 (App.Div.), aff'd, 28 N.J. 17, 145 A.2d 15 (1958). In Maryland Cas., this court concluded that an accident must be covered by the "loading and unloading" clause of an auto insurance policy when the injury "occurred during the process of loading or unloading the vehicle and [was] causally connected with that act." Id. at 320, 137 A.2d 577. Maryland Cas. involved a driver of a truck who was injured while on Camden Marine Terminal's premises to pick up rolls of paper. One of Camden Marine's employees *826 was using a forklift to take the rolls of paper from a barge and load them onto the driver's truck when he negligently struck the driver with the roll of paper. Id. at 317-18, 137 A.2d 577. The insurance company for the trucking company which was being sued for a declaratory judgment for indemnification argued that use of the forklift was not considered use of the truck for purposes of loading/unloading coverage. This court disagreed and held that the actions of defendant's employee were clearly "part of the complete operation of loading." Id. at 321, 137 A.2d 577.
In a later case, this court extended the concept of what constitutes the complete operation of the loading/unloading process. Drew Chem. Corp. v. American Fore Loyalty Group, 90 N.J.Super. 582, 218 A.2d 875 (App.Div.1966). Prior to Drew, New Jersey followed the "coming to rest" doctrine which only extended liability coverage to those accidents which occurred during the time the articles of merchandise are actually removed and lifted from the motor vehicle until those articles are taken off the vehicle and come to rest. Drew, supra, 90 N.J.Super. at 586, 218 A.2d 875 (citing 95 A.L.R.2d 1129 (1964), supplementing 160 A.L.R. 1259 (1946)). This court rejected the "coming to rest" doctrine in favor of the more "modern and enlightened" doctrine of "complete operation" which merely requires " `that the act or omission which resulted in the injury was necessary to carry out the loading or unloading.' " Id. at 589, 218 A.2d 875 (quoting Employers' Liab. Assurance Corp. v. Indemnity Ins. Co., 228 F.Supp. 896 (D.Md.1964)).
This court noted that the scope of the doctrine, however, is shaped by the particular factual context of each case. Id. at 587, 218 A.2d 875. In Drew, the driver of a truck loaded with fatty acid was injured on the premises of Drew Chemical Corporation while trying to transfer the acid from his truck to Drew's vats. Id. at 584, 218 A.2d 875. In order to transfer the acid, the driver had to utilize an iron pumpline provided by Drew. However, on the day of the accident the pumpline was clogged. The driver and an employee of Drew attempted to unclog the line by first running air pressure through the line. The first attempt being unsuccessful, the defendant's employee ran steam pressure through the hose, which caused the hose to whip about, striking and injuring the driver of the truck. Ibid. Under these circumstances, this court held that the injury occurred during the course of the unloading process. We said:
While the act of clearing the line was normally not part of the unloading operation, it was, under the existing circumstances, a necessary one. The presence of the clogged line led to [Drew's employee] taking a reasonable step in helping to unload the tank truck, and this with the implied permission of [the truck driver]. In short, the process of unloading the acid necessitated the very act (clearing the line) which, in turn, caused the accident.

[Id. at 591, 218 A.2d 875.]
As noted recently by the Supreme Court of New Jersey, "[u]nder the `complete operation' doctrine, as defined by the Drew court, the distinction between preparations for loading and the act of loading is obliterated." Kennedy v. Jefferson Smurfit Co., 147 N.J. 394, 400, 688 A.2d 89 (1997). This doctrine covers the "entire process" of moving goods and "reflects the reasonable contemplation of the parties." Drew, supra, 90 N.J.Super. at 586-87, 218 A.2d 875.
In Kennedy, the owner of a tractor was dispatched by the company which leased his tractor to Jefferson Smurfit Company to pick up a trailer loaded with cardboard which he was to deliver to a packaging corporation. Kennedy, supra, 147 N.J. at 396, 688 A.2d 89. The cardboard in the trailer was loaded on wooden pallets and wrapped in bundles weighing about 100 pounds each. Ibid. He inspected the goods and when they seemed in *827 order left for the packaging corporation. When he arrived at the corporation, he waited in the trailer and watched the unloading procedure. However, one of the pallets was rotted and it collapsed and fell on Kennedy causing injuries. Ibid.
Although Kennedy's injuries were sustained during the course of the unloading process, Jefferson's negligent act of selecting a pallet occurred prior to the physical loading and unloading of the goods. In applying the doctrine of complete operation, the Court found that the selection of the defective pallet was "an integral part of the loading operation" because the pallets were necessary components utilized to load the goods and therefore the selection process can be considered preparation which is clearly not distinct from the loading/unloading process itself. Id. at 401, 688 A.2d 89.
Here, the trial judge found that plaintiff's fall was caused by string used by retail customers at IKEA. This conclusion was founded on the allegations in plaintiff's amended complaint, his testimony, and Dugan's testimony. It is well established that an appellate court must respect the findings of a trial judge unless " `they are so wholly insupportable as to result in a denial of justice' and . . . should exercise its original fact finding jurisdiction sparingly." Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974) (citations omitted). The factual determination that plaintiff fell only on string rather than both the string and the nylon strapping is supported by adequate, substantial and credible evidence in the record and should not be disturbed by this court. See New Jersey Turnpike Auth. v. Sisselman, 106 N.J.Super. 358, 370, 255 A.2d 810 (App.Div.), certif. denied, 54 N.J. 565, 258 A.2d 16 (1969). Furthermore, credibility is always for the fact finder to determine. Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 492, 126 A.2d 323 (1956).
This finding controls the disposition of IKEA's claim against Reliance. Once it is determined that the fall was caused by the condition of the premises, the case is controlled by those cases which deny coverage under the loading/unloading clause "because the accident arose not from the loading or unloading activities, but from the negligent acts of the owner of the premises where the accident occurred, prior to the loading or unloading of the motor vehicle." Kennedy, supra, 147 N.J. at 401-02, 688 A.2d 89. The distinction between negligence in the loading and unloading operation and negligence in the maintenance of premises is well-recognized. In Forsythe v. Teledyne Turner Tube, 209 N.J.Super. 608, 508 A.2d 1156 (App.Div.1986), this court described it as the difference between
cases where there is negligence in the actual loading and unloading operation, such as by an employee of a warehouse in loading a truck, and those cases where the negligence is not directly related to the loading and unloading, but the accident occurs during the loading and unloading process, such as where there is a dangerous condition on the premises of the warehouse.
[Forsythe, supra, 209 N.J.Super. at 616, 508 A.2d 1156.]
See also Neuman v. Wakefern Foods, 205 N.J.Super. 263, 266, 500 A.2d 752 (App. Div.1985) (denying coverage when design defect or defect in maintenance of a hand truck caused injuries to driver because the negligence was not directly dependent upon the act and preparation of the loading/unloading process); Wakefern Food Corp. v. General Accident Group, 188 N.J.Super. 77, 84, 455 A.2d 1160 (App.Div. 1983) (denying coverage when driver was injured by debris left on defendant's premises which created a hazardous condition which had no reasonable connection to the loading/unloading process).
Here, plaintiff fell on string that is used solely by IKEA customers to secure merchandise to their trunks or car roofs.
*828 Plaintiff presented testimony that he did not use the string and that none of the delivery truck companies use the string for the loading/unloading process of merchandise. Based on the record, the loading/unloading process is not implicated at all with regard to plaintiff's accident and injuries because the hazardous condition created by the string was not " `within reason' a condition necessary to the act of loading nor had it any reasonable connection to that work." See Wakefern Food Corp., supra, 188 N.J.Super. at 84, 455 A.2d 1160. Therefore, given the facts of the present record, Reliance should not be held liable to indemnify and hold harmless IKEA pursuant to its loading/unloading provisions of its policy.
For the foregoing reasons, the judgment in favor of third-party defendant, Reliance, is affirmed. However, the judgments in favor of defendants IKEA and USI are reversed and the matter as to them is remanded for trial.
NOTES
[1] Until trial, USI was a third-party defendant. In its third-party complaint against USI, IKEA alleged that USI was negligent in performance of its cleaning services and it sought contribution. On August 31, 1998, plaintiff was allowed to file an amended complaint and name USI as a direct defendant. Trial commenced the next day. Although no further pleadings were filed, we construe the third-party claim by IKEA to serve as a cross-claim for contribution. See R. 4:5-4.