774 A.2d 700

FLORENCE RYDER, PLAINTIFF–RESPONDENT, . v. OCEAN COUNTY MALL AND CORPORATE PROPERTY INVESTORS, DEFENDANTS–APPELLANTS, AND PLANNED BUILDING SERVICES, INC., DEFENDANT/THIRD PARTY PLAINTIFF–RESPONDENT, v. SENICA SECURITY, THIRD PARTY DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 23, 2001—Decided June 1, 2001.

Before Judges NEWMAN and WELLS.

*Robert J. Gallop* argued the cause for appellants (*Braff, Harris & Sukoneck*, attorneys; *Mr. Gallop* of counsel and on the brief).

*Brett R. Greiner* argued the cause for respondent, Florence Ryder (*Levinson Axelrod*, attorneys; *Mr. Greiner*, of counsel and on the brief).

*Theresa E. Mullen* argued the cause for respondent Planned Building Services, Inc. (*Sachs, Maitlin, Fleming, Greene, Wilson & Marotte*, attorneys; *Ms. Mullen*, of counsel and on the brief).

*Bruce A. Tritsch* argued the cause for respondent Senica Security (*Feinberg and Tritsch*, attorneys; *Mr. Tritsch*, of counsel and on the brief).

The opinion of the court was delivered by

WELLS, J.A.D.

Defendants Ocean County Mall and Corporate Property Investors, (Mall) appeal from an order which granted motions of involuntary dismissal at the close of all the evidence during a jury trial in favor of co-defendant Planned Building Services, Inc. (PBS) and in favor of third-party defendant Senica Security (Senica). The Mall also appeals from a judgment entered following the jury's verdict which awarded damages of $7500 against it in favor of the plaintiff, Florence Ryder. We reverse the orders of involuntary dismissals in favor of PBS and Senica but affirm the judgment in Ryder's favor.

For purposes of this appeal the facts are not in material dispute. The Mall owns and operates a large suburban shopping center. It entered into a contract for the performance of maintenance and janitorial services with PBS. Timothy McLaughlin, the security director for the Mall testified that porters for PBS were directly responsible for walking in the common area and policing or picking up any kind of debris or spills. McLaughlin testified that the Mall is divided in essence into three areas, A, B, and the food court area also described as zones 1–4. He testified that as porters patrol the common area of the Mall they are specifically looking for spills and debris.

The operations manager for PBS, Raymond D'Armes, was produced for depositions on behalf of PBS. Various portions of D'Armes deposition were read during trial. D'Armes admitted that part of PBS' responsibilities at the Mall was to police the common area. D'Armes admitted that PBS had at least one person policing one-half of the Mall, another person policing the other half of the Mall, and other people in the food court area.

D'Armes admitted that at a minimum there were always two PBS employees policing the entire Mall.

The Mall also hired Senica to provide security services. McLaughlin testified as to its responsibilities regarding the common areas of the shopping center. He stated that employees of Senica Security have a number of duties while patrolling the Mall, including looking for anything that might be a hazard to a customer.

The Mall established the schedule for Senica and determined the number of officers who were to patrol and the days and hours of the work. Senica's duties, according to McLaughlin, were to be done in compliance with the standards of the industry and as set by the Mall. Senica's work was also supervised by the Mall.

The Mall directed the security staff to make random patrols. This was described by McLaughlin as walking in a random pattern, with direction being varied. The security staff was also instructed to stop at the kiosks and to talk to the merchants. They were also available to help and talk to customers and were to be friendly. The security personnel were also directed by the Mall to go to the outside sidewalk and entrance ways to see if there were any concerns. The officers were to take their time on patrol so as to accomplish all they were supposed to do.

On the day of Ryder's accident, November 18, 1995, the Mall had five security people on duty-three Senica employees, an off-duty police officer, and Security Director McLaughlin. Of the three Senica personnel, one patrolled the exterior of the Mall and the other two worked inside.

According to McLaughlin, there was one officer assigned to zones one and two, and a second officer assigned to zone three and four. To complete a round of one zone, the officer would take fifteen to twenty minutes. It would take an officer thirty to forty minutes to cover both of his assigned zones.

Ryder testified that as she was walking in the Mall on a Christmas holiday shopping excursion, she suddenly fell. When

she was helped up to a seat on a nearby planter, she observed a clear liquid on the floor nearby with some foam around its edges. Because she "was full of this drink from my heels up to the top of my head" she realized it was that liquid in which she slipped. The liquid was described as a drink called "Orange Julius." Ryder suffered injuries as the result of her fall and filed suit against the Mall and PBS. PBS, in turn, filed a third-party action against Senica. Cross-claims for indemnification and contribution were filed by all the defendants against each other.

At trial, at the close of all the evidence, the judge granted the motions of PBS and Senica for involuntary dismissal. As to PBS the judge reviewed the contract in evidence between it and the Mall and concluded that because it did not specifically require PBS to "patrol" the Mall, it could not be held responsible. As to Senica, whose contract with the Mall was not in evidence, the judge found that while it did have a duty to patrol, there was no evidence that Senica did anything other than what it was contracted to do and was therefore not negligent.

The judge then submitted the case to the jury charging it on the duty of reasonable care owed to a business invitee, negligence, proximate cause, damages and constructive notice. She also charged:

> [W]hen a plaintiff has shown that the circumstances were such as to create the reasonable probability that the dangerous condition would occur, she need not also prove actual or constructive notice of the specific condition. Factors bearing on the existence of such reasonable probability would include the nature of the business, the general condition of the premises, a pattern of conduct or reoccurring incidents.

After deliberating the jury returned a verdict in favor of Ryder finding 100% liability against the Mall and damages of $7500.

We deal first with the Mall's contention that the quoted charge should not have been given in this case. The charge comes from *Bozza v. Vornado, Inc.*, 42 *N.J.* 355, 360, 200 *A.2d* 777 (1964). There a patron of a self-service cafeteria fell when, upon arising from her seat at the counter, she stepped into a "sticky," "slimy" substance on the floor behind her seat. She also saw other

drippings and debris on the floor and that upon being helped up her hands, knees and dress were dirty. The court noted that "an inference arises that a dangerous condition existed." *Bozza, supra* 42 *N.J.* at 358, 200 *A.*2d 777. Accordingly, the Court found that even without an inference of constructive notice, and "[a]bsent an explanation by defendants, a jury could find from the condition of the premises and the nature of the business that defendants did not exercise due care in operating the cafeteria . . ." *Bozza, supra* 42 *N.J.* at 359, 200 *A.*2d 777, *See Torda v. Grand Union Co.,* 59 *N.J.Super.* 41, 157 *A.*2d 133 (App.Div.1959); *Wollerman v. Grand Union Stores, Inc.,* 47 *N.J.* 426, 221 *A.*2d 513 (1966)(holding that an operator must do what is reasonably necessary to protect the customer from the risk of injury a particular mode of operation is likely to generate); *Craggan v. IKEA USA,* 332 *N.J.Super.* 53, 752 *A.*2d 819 (App.Div.2000).

The Mall argues that there was no testimony of poor or improper conditions, maintenance or cleanliness at the shopping center or other practices which would lead to a general state of disorder at the Mall. Hence it was error to permit the jury to consider the facts without some evidence of constructive notice of the spill of Orange Julius.

We disagree and affirm the judge's charge based on *Bozza* and its progeny. There was evidence that the Mall does not restrict the carrying of, or consumption of, food and drink anywhere in the common areas of the Mall. Indeed, near the planter where Ryder fell, patrons are accustomed to sit and eat. McLaughlin himself had observed the planter being used in that fashion. Given that mode of operation, the Mall becomes the functional equivalent of a cafeteria. It was not uncommon to get reports of one or more spills everyday and more spills are reported on weekends and during the holiday season. The Mall, therefore, can reasonably be charged with notice that food and drink spills are likely to occur and do occur anywhere and at any time in the common areas.

█ We are, therefore, satisfied that the judge erred in granting the motions to dismiss PBS and Senica. The judge took an overly restrictive view of the PBS contract. While it is true that it did not use the word "patrol," it is clear that PBS had undertaken a broad contractual responsibility to the Mall to maintain and to police the common areas and to supply personnel during the open hours of the shopping center to implement that responsibility. The same is true of Senica with respect to security. One of their overlapping responsibilities was to keep an eye out for spills or other obstructions on the floors of the common areas that might present a hazard to the patrons of the Mall.

█ Furthermore, while it is true that the holding of *Bozza* does not apply to the Mall's subcontractors, to the extent that there was sufficient evidence to submit to the jury on the issue of constructive notice in connection with the Ryder's claim against the Mall, that was, as well, a ruling that sufficient evidence existed on the cross claims for indemnification that PBS and/or Senica had failed to notice a spill which would trigger their respective contractual responsibilities.

And, indeed, there was such evidence. McLaughlin testified in considerable detail, using a map of the inside of the Mall, just how the common areas were allocated for both maintenance patrols and security purposes, the number of "porters" (the maintenance personnel) and security people on duty and their specific responsibilities with respect to spills. He noted that these persons were all connected by two-way radios. His testimony was consistent with the need generated by the very freedom discussed above with which patrons were permitted to carry food and drink in the common areas. Clearly, a legitimate inference arises out of all of this evidence that spills were common but that they would be quickly spotted, safe-guarded and cleaned up. It then is a classic jury question whether the maintenance and security coverage plans broke down and, if so, upon whom, as between the Mall itself and its two subcontractors, the fault lay and to what degree.

Affirmed as to the judgment in favor of Ryder.  Reversed and remanded as to the cross claims for indemnification.